In re Paul Hiram JOHNSON, Debtor.

**Tim ROLLAND, Kenneth Rolland, Plaintiffs,**

v.

**Paul Hiram JOHNSON, Defendant.**

**Bankruptcy No. 87–62145.
Adv. No. 88–6020.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division
at Gary/Lafayette.

April 14, 1989.

David Wickland, Munster, Ind., for debtor.

William Kowalski, E. Chicago, Ind., for plaintiffs.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

KENT LINDQUIST, Chief Judge.

### I

### *Statement of Proceedings*

This adversary proceeding came on for bench trial on April 6, 1989 pursuant to Order of Court, February 14, 1989.

The Plaintiffs Tim Rolland (hereinafter: "Plaintiff Tim") and Kenneth Rolland (hereafter: "Plaintiff Ken") by their complaint filed February 12, 1988 alleged that the Debtor–Defendant, Paul Hiram Johnson (hereinafter: "Debtor") intentionally, unlawfully, and without justification shot each of the Plaintiffs with a 38 caliber pistol, and thus the damages they incurred as a result thereof are nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

Pursuant to Clause 5 of pretrial order of June 30, 1988, the issue of dischargeability was severed from the issue of damages pursuant to Fed.R.Civ.P. 42(b) as made applicable by Bankr.R. 7042, and thus the issue of damages was not tried at this stage of the proceedings.

Plaintiffs appeared by Attorney Kowalski.

Defendant appears by Attorney Wickland.

Submitted. Evidence and arguments heard.

### II

### *Findings of Fact*

The Plaintiff Tim testified that prior to the shooting which occurred on September 22, 1984, his brother, the Plaintiff Ken and the Defendant's daughter, Tammy, were to be married. At this time the Plaintiff Tim was residing with his parents about a mile from the Defendant's residence, and had no prior disputes with the Defendant at the time.

The Plaintiff Tim further testified that he went to the Defendant's residence, a trailer, at about 9:45 o'clock P.M. on the date in question, and upon seeing the Plaintiff Ken and Tammy outside the trailer, all three proceeded to go inside. According to the Plaintiff Tim at this time the Defendant's wife was asleep in the bedroom and the Plaintiffs and the Defendant were all seated on a couch in the living room directly across from a TV located against the opposite wall of the living room. They all then proceeded to watch the TV.

According to the Plaintiff Tim, the Defendant was seated on the left end of the couch, the Plaintiff Tim was in the middle, and the Plaintiff Ken was on the right end thereof.

The Plaintiff Tim related that Tammy left the trailer after about 1/2 hour after they commenced watching TV and was outside the trailer or near the Plaintiff Ken's car leaving the two Plaintiffs and the Defendant as the only persons in the living room.

According to the Plaintiff Tim, the Defendant then began "playing" with a loaded 38 police special revolver which he stat-

ed he had just purchased, and eventually the Defendant handed the revolver to the Plaintiff Ken who proceeded to unload the same. However, per the Plaintiff Tim, each time the Plaintiff Ken unloaded the revolver, the Defendant proceeded to reload the same. This occurred on three separate occasions.

The Plaintiff Tim asserted he had one beer while watching TV while the Plaintiff Ken had three or four beers, and the Defendant was drinking Vodka. However, according to the Plaintiff Tim he was sober, the Plaintiff Ken did not appear or act drunk, and that the Defendant "knew what he was doing". The Plaintiff Tim also declared neither Plaintiff was using drugs on the day in question.

The Plaintiff Tim averred that while watching TV, and after the revolver had been reloaded three times, the Defendant proceeded to fall asleep at the left end of the couch with the revolver resting between the Defendant and the left end of the couch, and that after the TV program was over (some 10 minutes thereafter), the Plaintiff Tim headed for the front door of the trailer to the right of the couch to leave, while at the same time, the Plaintiff Ken crossed the room to turn off the TV.

The Plaintiff asserted that at this point, while the room was fully lit, the Defendant suddenly awoke from his sleep, and without saying a word pulled the revolver out of the couch, pointed the same directly at the Plaintiff Ken, who was standing by the TV about ten feet away, and shot at him once striking him in the abdomen. The Defendant then immediately pointed the revolver directly at the Plaintiff Tim, about 8 feet away, and fired four more times in rapid succession striking him four times.

The Plaintiff Tim declared that just prior to the shooting neither Plaintiff was armed, neither was disturbing the peace, or the person, or the property of the Defendant, and neither had given the Defendant any reason whatsoever to shoot them, i.e. there had been no arguments or anything done to provoke the Defendant in any way.

The Plaintiff Tim subsequently signed a written statement with the police at the hospital waiving prosecution, because he knew the Plaintiff Ken was going to marry the Defendant's daughter Tammy and would be "part of the family".

The Plaintiff Ken's testimony was essentially the same as that of the Plaintiff Tim. In addition, he stated he had been at the Defendant's trailer about one to one-half hours before the Plaintiff Tim arrived, and was drinking beer and watching TV with the Defendant who was drinking Vodka. The Plaintiff Ken added that right after he was shot by the Debtor he asked the Defendant why he shot him and the Defendant said he "didn't know". He also stated that the first time he ever saw the revolver was on the night in question, though he had visited the trailer many times in the past—almost on a daily basis.

The Plaintiff Ken stated he had lived with the Debtor for approximately one year, and always felt that he had a very good and close relationship with the Defendant, almost equal to that of father and son.

According to the Plaintiff Ken, although the Debtor was drinking Vodka his motor skills and speech appeared to be normal before he fell asleep.

The Debtor testified that on the day in question he had had a "few" drinks of whiskey and water beginning about 1:00 o'clock P.M. while helping his brother, and that he returned to his trailer around 5:00 o'clock P.M. where he proceeded to watch TV and ate a "few bites", and then preceded to begin drinking vodka and water.

The Debtor's version of what transpired coincides with that of the Plaintiffs, except that he recalls that when he fell asleep he did so in a chair, that the revolver was on a table next to the chair, that he was watching TV in the living room in the dark, and that the only other person in the trailer when he fell asleep was his wife who was in the bedroom—the Plaintiffs both having gone outside to talk to Tammy. In his deposition the Defendant stated that he thought the Plaintiff Tim was still in the room when he dozed off. (Dep. 6/12/87, p. 8 LL. 18–24).

The Debtor asserts that he was "roused" from his sleep by the front door slamming, and that he saw two "dark images" in the front doorway. The Debtor asserted that although he could not see their faces he thought two black people were trying to break into the trailer and picked up the revolver and shot at those images not knowing at the time they were the Plaintiffs. He admitted that this was speculation on his part that the images were "robbers".

The Debtor declared that he was shocked to learn he had shot the Plaintiffs, and would not have fired the revolver if he had known who they were.

The Debtor declared that he had owned the revolver for approximately two months prior to the accident and had used the same for target shooting only.

The Debtor stated that when he awoke he thought the two images that turned out to be the Plaintiffs were "robbers", as to his knowledge the Plaintiffs had left the trailer before he went to sleep, and thus he thought he was alone in the room when he fell asleep.

The Debtor testified that he was "feeling it" from the drinking, but that he knew what was going on. He admitted he took no steps to determine or make inquiry as to who was actually in the room when he shot, that he saw no weapons, that no one made any menacing movements or gestures towards him, and that he did not intend to fire any warning shots. The Debtor declared he intended to shoot the "images" in the legs, although his Deposition of June 12, 1987 states he intended to shoot in the "midsection", (Dep. 6/12/87, p. 15, LL. 15–17).

The Debtor admitted that he intended to pick up the revolver, point it at the images and discharge the same, but that he had no intention whatsoever to shoot the Plaintiffs.

Admitted in evidence as Defendant's Exhibits No. 1 and 2 were Gary Police Department Disposition Forms in which the Plaintiffs stated that they did not wish to prosecute the Defendant. Also admitted was Defendant's Exhibit No. 3 in which the preparer of the report stated that the Plaintiff Ken advised the officer that he was "shot accidentally". Finally admitted into evidence as Defendant's Exhibit No. 4 was the report of the Pathology Department of Gary Methodist Hospital showing an alcohol content of the Defendant of 143.9H (sic).

### III

### *Conclusions of Law and Discussion*

This Court in the case of *In re Mills*, Case No. 86–62184 (*Shaver Motors v. Mills*, Adversary Proceeding No. 87–6027) (Bankr.N.D.Ind., J. Lindquist, unpub. opin. Dec. 29, 1988) had the occasion to discuss what constitutes "willful and malicious" injury to another entity or the property of another entity for the purposes of § 523(a)(6). Because of the difficulty the Courts have encountered in formulating a workable definition, the Court will take the liberty of setting out substantial excerpts from the *Mills* case. There the Court, in part, stated as follows:

11 U.S.C. § 523(a)(6) provides as follows:

(a) a discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt.—

  *   *   *   *   *   *

(6) For willful and malicious injury by the Debtor to another entity or to the property of another entity.

The legislative history to this provision must be carefully scrutinized regarding this provision. The House Report is as follows:

Paragraph (6) excepts debts for willful injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473 (1902) [24 S.Ct. 505, 48 L.Ed. 754, 11 Am.Bankr.Rep. 568], held that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a "reckless disregard" standard, they are overruled. H.R.Rep. 95–595,

95th Cong., 1st Sess. 365 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6320–6321; Reprinted in 4 *Norton Bankruptcy Law and Practice, Legislative History*, § 523, p. 404 (Callaghan & Co. 1983).

The legislative statements to this section add the following comment:

> Section 523(a)(6) adopts the position taken in the House bill and rejects the alternative suggested in the Senate amendment. The phrase "willful and malicious injury" covers a willful and malicious conversion.

124 Cong. Rec., H11096 (Daily Ed. Sept. 28, 1978); S17412 (Daily Ed. Oct. 6, 1978); Reprinted in 4 *Norton Bankruptcy Law and Practice, Legislative History*, § 523, p. 404–405 (Callaghan & Co. 1983). (Emphasis added).

The Supreme Court in *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), provided a definition of "malicious injury". *Tinker* involved a state court action against a bankrupt for damages arising from criminal conversation with the plaintiff's wife. At issue was whether the bankrupt's acts were willful and malicious injury to the plaintiff's property rights, and thus nondischargeable under Section 17(a)(2) of the Bankruptcy Act of 1898.[1]

The Supreme Court in *Tinker* for the purposes of Section 17(a)(2) concluded:

> [W]e think a willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception.

*Id.* at 487, 24 S.Ct. at 509, 48 L.Ed. 754.

The legislative history of the Bankruptcy Code reflects that Congress clearly intended a standard of intentional and deliberate conduct, and not merely a willful disregard or reckless conduct.

*Collier on Bankruptcy* has made a helpful analysis of § 523(a)(6) as follows:

In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite or ill-will. The word "willful" means "deliberate or intentional," a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury. It has been said that this category of liabilities excepted from discharge "contemplates something more restricted than malice in the broader sense," and covers all cases in which the facts of intent and malice are judicially ascertained, irrespective of the character of the allegations made by the parties. Injuries within the meaning of the exception are not confined to physical damage or destruction; but an injury to intangible personal or property rights is sufficient. Thus the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is willful and malicious injury within the meaning of the exception. On the other hand; a technical conversion may very well lack any element of willfulness or maliciousness necessary to except the liability from discharge.

A claim or judgment based merely upon negligence does not necessarily constitute a willful and malicious injury within the exception even if the negligence is alleged to be reckless and wanton. Under this paragraph, "willful" means deliberate or intentional. Cases decided under section 17a(2) of the former Bankruptcy Act, such as *Tinker* to apply a "reckless disregard" standard, they are overruled. In *Greenfield v. Tuccillo* [129 F.2d 854] the Second Circuit Court of Appeals said, citing *Tinker:*

---

**1.** See 11 U.S.C. § 35(a)(2), repealed 1978. Section 17(a)(2) is the predecessor provision under the Bankruptcy Act of 1898 to § 523(a)(6) of the Code.

"The question is whether the liability to Greenfield was for "willful and malicious" injuries. Such injuries have been defined by the Supreme Court as arising from an act involving a "willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally." *Tinker v. Colwell*, 193 U.S. 473, 487 [24 S.Ct. 505, 509, 48 L.Ed. 754], 11 AM.B.R. 568. *See, McIntyre v. Kavanaugh*, 242 U.S. 138 [37 S.Ct. 38, 61 L.Ed. 205], 38 AM.B.R. 165; *Brown v. Garey*, 28 AM.B.R. (N.S.) 270, 267 N.Y. 167, 169 [196 N.E. 12]. . . .

It is clear from both the House and Senate Reports that the standard of "reckless disregard" as expressed in *Greenfield* will no longer be applicable, and the many cases holding various degrees of recklessness to constitute willfulness and maliciousness will no longer be controlling in construing section 523(a)(6) of the Code.

3 *Collier on Bankruptcy*, 523.16 (pp. 511–14) (L. King 15th Ed.) (Footnotes omitted).

The formulation and application of a precise definition of "willful and malicious" to be applied generally has been a difficult one for the courts.

The definition of "willful" has given the courts the least problem, and most courts have followed the legislative history and have held that "willful" means a deliberate or intentional act. *See, In re Adams*, 761 F.2d 1422, 1426 (9th Cir.1985); . . .

Thus "willful and malicious" does not mean reckless disregard or mere negligence. *In re Compos*, 768 F.2d 1155, 1157 (10th Cir.1985); . . .

However, as pointed out by the court in the recent case of *In re Cecchini*, 780 F.2d 1440, 1442 (9th Cir.1986), the courts are split over the interpretation of the phrase "willful and malicious" even though the act must be found to be intentional. The word "malicious" is less susceptible to precise definition, and has always been a difficult concept for the court to apply. That is, as *Cecchini* points out, some courts have

found this phrase requires an intentional act which *results* in injury; . . ., while other courts have found that phrase requires an act with the *intent to cause injury*. . . .

The plaintiff in *Cecchini* urged that the looser standard of "willful and malicious" refers to an intentional act which causes injury. Under this construction the creditor would not be required to prove that the debtor acted with intent to injure, i.e. actual or specific malice and that implied or constructive indicia is suffice. The *Cecchini* court noted that the plaintiff's construction was in accord with other circuits that recently addressed the matter. *Cecchini*, 780 F.2d at 1442; . . .

Accordingly, *Cecchini* holds that when a wrongful act, such as conversion is done intentionally, necessarily produces harm, and is without just cause or excuse, it is "willful and malicious" even absent proof of specific intent to injure.

Thus, one line of cases is that malice may exist by implication or constructively because the debtor's actions indicate he knew that his actions would result in injury, but acted in disregard of that knowledge. . . .

The other line of cases holds that malice cannot exist constructively or by implication, but must be evidenced by specific intent to injure a person or his property. . . .

The specific intent requirement has been sharply criticized for placing an almost insurmountable burden on the creditor. This is particularly true in the area of conversion, as most conversions of property are made to reduce financial strain and reduce expenses rather than to injure the creditor's interest specifically. *See* Comment, *Accidental "Willful and Malicious Injury": The Intoxicated Driver and Section 523(a)(6)*, 1 Bankr.Dev.J. 135, 141 (1984).

As the court in *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003 (4th Cir.1985) stated:

\* \* \* \* \* \*

To require specific malice or some other strict standard of malice for non-dischargeability of a debt under the Bankruptcy Code would undermine the pur-

poses of that provision and place "a nearly impossible burden" on a creditor who wishes to show that a debtor intended to do him harm. *United Bank of Southgate*, 35 B.R. [766] at 772. *See also, In the Matter of Nelson*, 10 B.R. 691 (Bkrtcy.N.D.Ill.1981); *In re Matter of Lewis*, 17 B.R. 46 (Bkrtcy.W.D.Ark.1981); *In re Fussell* [15 B.R. 1016 (W.D.Va. 1981)], *supra*. To require such specific malice would restrict § 523(a)(6) to the small set of cases where the debtor was foolhardy enough to make some plainly malevolent utterance expressing his intent to injure his creditor.

*Id.* at 1008–1010.

This court adopts the reasoning of *Cecchini, St. Paul Fire & Marine Ins. Co.*, and *United Bank of Southgate*, and holds "willful and malicious" to be an intentional or deliberate wrongful act, done without excuse or just cause, which produces or results in harm or injury, and that the wrongdoer need not have a specific intent to cause the resulting harm or injury to the person and property of the plaintiff. It is the intent to do the act which is the operative legal event, and not the intent to do the harm....

Thus, the phrase "willful and malicious" under 11 U.S.C. § 523(a)(6) does not connote or require personal hatred, ill-will, spite or special malice.... That is, a specific intent to do harm is not necessary....

It must also be noted that the use of the conjunctive and the phrase "willful and malicious", requires that both elements be present in order for the debt to be nondischargeable....

In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the debtor.... The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code.... This is done to effectuate the fresh start policies of the Bankruptcy Code....

Although, the nondischargeability provision of the Bankruptcy Code has no provisions allocating the burden of proof

brought under it, the creditor must establish that the debt is nondischargeable and has the burden on each element. *In re Kreps*, 700 F.2d 372, 376 (7th Cir.1983); ... The creditor objecting to discharge of a debt in bankruptcy bears a heavy burden of proof to establish that the debt is squarely within the statutory exceptions.... *In re Marino*, 29 B.R. [797], 799 [(N.D.Ind.1983)], *supra*.

The court would also note that the standard of proof to be applied in a nondischargeability proceeding under §§ 523(a)(2)(A), (4) and (6), is that of clear and convincing evidence, rather than by a preponderance of the evidence. *In re Kimzey*, 761 F.2d 421, 423–424 (7th Cir. 1985)....

It is true as general proposition, that "liabilities arising from assault and battery are generally considered as founded upon a willful and malicious injury and therefore within the exception". 3 *Collier on Bankruptcy*, para. 523.16, P. 523–120 (L. King, 15th ed.). *See, e.g., Smith v. Pitner*, 696 F.2d 447 (6th Cir.1982) (Debtor shot and killed husband of judgment creditor in barroom altercation); *In re Wilson*, 49 B.R. 952 (Bankr.M.D.Ala.1985) (Debtor shot neighbor in domestic dispute); *In re Siefke*, 61 B.R. 220 (Bankr.D.Mont.1986) (Debtor beat arresting officer); *In re Beach*, 39 B.R. 56 (Bankr.W.D.Ky.1984) (Debtor shot waitress during tavern brawl); *In re LaCasse*, 28 B.R. 214 (Bankr.D.Minn.1983) (Debtor shot gun into parked camper); *In re Irvin*, 31 B.R. 251 (Bankr.D.Colo.1983) (Debtor stabbed plaintiff in lover's quarrel); *Matter of Rice*, 18 B.R. 562 (Bankr.N.D.Ala.1982) (Debtor shot plaintiff as innocent bystander when intended to shoot third party); *In re White*, 18 B.R. 246 (Bankr.E.Va.1982) (Debtor liable even though Debtor intended to shoot someone else); *In re Sturtevant*, 49 B.R. 310 (Bankr.D.Miss.1985) (Debtor pushed plaintiff off porch and then kicked); *In re Cunningham*, 59 B.R. 743 (Bankr.N.D.Ill.1986) (Debtor struck plaintiff); *In re Domingue*, 59 B.R. 5 (Bankr.M.D.La.1985) (Debtor assaulted plaintiff); *In re Slee*, 40 B.R. 825 (Bankr.D.Vt.1984) (Debtor struck plaintiff);

*Matter of Moccio,* 41 B.R. 268 (Bankr.N.J. 1984) (Debtor began fight with plaintiff who did not willingly participate); *In re Chapman,* 46 B.R. 90 (Bankr.N.D. Ohio 1985) (Debtor struck and kicked plaintiff while helpless); *In re Nuckols,* 47 B.R. 731 (Bankr.E.D.Va.1985) (Debtor flung plaintiff's wife across room by leg); *In re Hines,* 37 B.R. 553 (Bankr.E.D.Tenn.1984) (Debtor struck plaintiff in face without provocation); *In re Bothwell,* 32 B.R. 617 (Bankr.N.D. Iowa 1983) (Debtor threw keys at former boy friend striking him in eye); *In re Trudeau,* 35 B.R. 185 (Bankr.D.Mass. 1985) (Debtor liable for striking plaintiff though plaintiff made prejudicial remarks about debtor).

The Court having had an opportunity to observe the witnesses and judge the credibility, and after weighing all the evidences finds that the testimony given by the Plaintiffs is more reliable and credible than that of the Defendant.

■ It is clear to this Court that based on the evidence, and the applicable law, that the Debtor willfully and deliberately placed the revolver in his hand, pointed the same at the Plaintiffs and shot with the express intent of causing serious bodily harm. There is no doubt that the Debtor had every avowed intention to so act, and this conduct certainly constituted more than just an accident or mere gross negligence or a reckless disregard of the consequences. Thus, the Plaintiff has clearly established the first prong of § 523(a)(6) in that it was intentional. There was no evidence from which it could be found that although the act was intentional it was done with just cause or excuse. The surrounding circumstances attendant prior to the shootings and at the very time of the shootings were not such as to justify or excuse the actions taken by the Debtor. The facts surrounding the shootings were not such as to conclude that the Defendant acted reasonably in believing the use of the weapon was necessary in self defense, and to protect his person or property.

■ Although the dischargeability of this debt is determined by federal standards, the Court may consult state law as to possible defenses to an intentional tort in order to determine if the intentional act was done with just cause and excuse. A person has a right to defend himself and his property. However, a person must have *reasonable* grounds to believe that he or his property is in danger before force may be used. *See, generally,* I.L.E. *Assault & Battery,* § 14.

■ It has been held that the danger of harm need not be real for the use of deadly force to be justified, but the Defendant must *reasonably* believe that danger of harm exists. *Leming v. State,* 487 N.E.2d 832 (Ind.App. 3rd Dist.1986) (interpreting I.C. 35–41–3–2). And a person is entitled to defend himself where it reasonably appears he is in danger of bodily harm; however, he is only justified in using such force as may appear to him to be necessary to resist an unlawful attack. *Woolum v. State,* 178 Ind.App. 212, 381 N.E.2d 1072, 1074, n. 3 (1978). In order to exercise the right of self-defense one must act honestly and conscientiously and not use excessive force. *Blair v. State,* 173 Ind.App. 558, 364 N.E.2d 793 (1977). In addition it is basic tort law that generally such defenses as consent, assumption of risk, and contributory negligence are not applicable as defenses to intentional torts such as assault and battery. *See,* I.L.E. *Assault and Battery* § 12.

■ As to the second prong of § 523(a)(6), i.e. "malicious", the established law is clear that the fact that the Debtor clearly held no ill will, hatred or spite versus the Plaintiffs or did not intend the results obtained is not a defense on this element. All that is required is that the Debtor deliberately did the act, i.e. shoot at the Plaintiffs. It is not necessary that the Plaintiffs prove the Debtor intended to cause the specific injuries they incurred. It is also not a defense that the Defendant may have mistaken the Plaintiffs for intruders and that had he known they were the Plaintiffs he would have never shot them. There was no reasonable cause or excuse for the Defendant to have fired the shots in question directly at the "images" even if some third parties other than the

Plaintiffs were in fact in the doorway without taking prior, reasonable steps to see what was transpiring. Certainly the prior conduct of the Plaintiffs or of any other person that night did not give the Debtor just grounds or excuse to so act.

Even assuming *arguendo*, that the Defendant in good faith believed his home was being entered without consent by strangers, and acted in self defense, he did not act *reasonably* in believing that grounds existed to so act in self defense under the facts and circumstances. Further, if he did act reasonably in believing that there was an unwarranted intrusion he used excessive force in an attempt to repel the perceived intrusion under the circumstances.

Accordingly, the Court concludes that the Defendant intentionally shot both Plaintiffs without just cause or excuse and that he possessed the requisite constructive malice as required by § 523(a)(6) in that he intended to fire the revolver and strike whomever he believed was in the room. The fact that he did not intend to shoot the Plaintiffs or cause the resultant harm is not a defense.

Accordingly, the Defendant's debt to the Plaintiffs is nondischargeable in his bankruptcy pursuant to § 523(a)(6).

The Court will now set this matter for a status conference on the trial of the issue of damages. It is therefore,

ORDERED, ADJUDGED, AND DECREED, that the Plaintiffs have judgment against the Defendant, and the indebtedness of the Defendant to the Plaintiffs is not dischargeable pursuant to 11 U.S.C. § 523(a)(6).