**In re Michele THOMPSON, Debtor.**

**Michael F. MERRITT, Plaintiff,**

v.

**Michele G. THOMPSON, Defendant.**

**Bankruptcy No. 91–20648.
Adv. No. 91–2042.**

United States Bankruptcy Court,
E.D. Michigan, S.D.
Flint.

Dec. 14, 1993.

Robert Detweiler, Howell, MI, for plaintiff.

Dani K. Liblang, Bloomfield Hills, MI, for debtor/defendant.

## *FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION REGARDING NONDISCHARGEABILITY*

ARTHUR J. SPECTOR, Bankruptcy Judge.

### *INTRODUCTION*

On December 5, 1986, Michele Thompson gave birth out of wedlock to a daughter, Kaitlen. Approximately two years later, Thompson prevailed in a paternity action brought against Michael Merritt in Livingston County Circuit Court, and Merritt was ordered to pay child support.

In September of 1990, Merritt sued Thompson in Genesee County Circuit Court for defamation. The action was based on statements allegedly made by Thompson to health care personnel, Child Protective Services (an agency of the Michigan Department of Social Services), and various other officials (collectively, the "authorities"), to the effect that Merritt had physically, sexually and emotionally abused Kaitlen. Thompson was interviewed by Barbara McClellan, a reporter for the Detroit News, in March, 1991. An article by McClellan describing the ongoing dispute between Merritt and Thompson was subsequently published in the March 25, 1991, edition of that newspaper.

Thompson filed a petition for relief under chapter 7 of the Bankruptcy Code on May 13, 1991. Merritt then initiated this adversary proceeding by filing a complaint alleging that Thompson was indebted to him in the amount of $250,000, based on the same statements as were the subject of the state-court lawsuit, as well as comments allegedly made by Thompson to McClellan. The complaint sought a determination that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

I have jurisdiction to hear and determine this action, 28 U.S.C. § 1334, which is a core proceeding. 28 U.S.C. § 157(b)(2)(I). This opinion contains my findings of fact and conclusions of law pursuant to F.R.Bankr.P. 7052. For the reasons which follow, I hold that the statements made by Thompson to McClellan gave rise to a nondischargeable debt in the amount of $1,050.

### DISCUSSION

Section 523(a) excepts from discharge "any debt—(6) for willful and malicious injury by the debtor to another entity." Merritt bore the burden of proving that the debt owed to him is nondischargeable under this statute. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). More fundamentally, Merritt also had to prove that Thompson is in fact indebted to him—an issue which is determined by nonbankruptcy

law. *In re Caldwell,* 111 B.R. 836, 837 (Bankr.C.D.Cal.1990); 4 *Collier on Bankruptcy,* ¶ 541.02[1] (15th ed. 1993). I will first consider the applicability of § 523(a)(6) to the facts of this case, and then address the question of liability and damages.

### I. *Nondischargeability*

#### A. Legal Standard

■ An act is willful under § 523(a)(6) if it is "done intentionally." *In re Woolner,* 109 B.R. 250, 254 (Bankr.E.D.Mich.1990). *See also Vulcan Coals v. Howard,* 946 F.2d 1226, 1228 (6th Cir.1991). It is malicious if the "actor knows [that the act] is substantially certain to result in harm to another," and if there is no "just cause or excuse" for the act. *Woolner,* 109 B.R. at 254. *See also Perkins v. Scharffe,* 817 F.2d 392, 394 (6th Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987); *Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986).[1]

Before tackling the often problematic questions concerning whether an act was "willful and malicious," however, care must be taken to specify exactly what "act" is to be subject to judicial scrutiny. Assume, for example, that the nondebtor plaintiff was wounded when the defendant/debtor fired a shot into a crowd of people out of boredom, without aiming at anyone in particular. The

---

1. The distinction between "willfulness" and "malice" is somewhat blurry because, depending on the context in which the terms are used, their respective meanings tend to overlap. As noted in a standard legal dictionary,

> The word [willfully] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal context it generally means an act done with a bad purpose; without justifiable excuse.... The word is also employed to characterize a thing done without ground for believing it is lawful or conduct marked by careless disregard whether or not one has the right to so act.

*Black's Law Dictionary* (5th ed. 1979; citation omitted; alteration in original); *cf. id.* (defining "malice" as "[t]he intentional [i.e., willful] doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent"). But using the term "willfulness" only in its most benign sense—i.e., stripped of those considerations having to do with the inherent evil-

ness of the act—is consistent with the Code's legislative history and Sixth Circuit precedent. *See* S.Rep. No. 989, 95th Cong.2d Sess. 79 (1978) (defining willful under § 523(a)(6) as meaning "deliberate or intentional" (*quoted in Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986))); *see also Perkins v. Scharffe,* 817 F.2d 392, 393 (6th Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987); *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) ("A failure to pay over taxes is willful, for [26 U.S.C.] section 6672 purposes, if it is voluntary, knowing and intentional even though it is not done with a bad purpose or an evil motive...." (citation omitted)). This approach also gives fuller effect to the term "malicious": if the adjective "willful" was intended to convey both intentional conduct *and* a wicked motive, then § 523(a)(6)'s malice requirement would add little or nothing to the analysis. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, ——, 111 S.Ct. 2166, 2172, 115 L.Ed.2d 96, 107 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.").

better view is that the plaintiff's injury was willfully inflicted because the debtor did not "accidentally" fire the gun. *See In re Hartley*, 100 B.R. 477, 479 (W.D.Mo.1988), *rev'd*, 869 F.2d 394 (8th Cir.), *vacated*, 874 F.2d 1254 (8th Cir.1989). But if the offensive act is instead defined as shooting the plaintiff, then the debt is discharged because that act was not intentional. *See Hartley*, 869 F.2d at 395 (debtor did not act willfully in throwing a firecracker into a basement permeated with gasoline fumes as a prank because "it is the injury to the creditor which must have been intentional—not the action of the debtor which caused the accident").[2] As this hypothetical illustrates, the disposition of a complaint brought under § 523(a)(6) will often turn on how one characterizes the injury-producing act.

That characterization must take into account the Sixth Circuit's opinion in *Wheeler*, *supra*. The Wheelers sued the debtor Laudani for a determination that a state-court libel judgment they obtained was nondischargeable under § 523(a)(6). The judgment was based on a document published and distributed by Laudani which contained statements accusing the Wheelers "of exploiting Mr. Wheeler's public office of City Councilman for personal benefit." 783 F.2d at 611.

Because Mr. Wheeler was a public official, the Wheelers had to prove in state court that Laudani published the defamatory statements "with 'actual malice' ... [i.e., with] 'knowledge that [the statements were] false or with reckless disregard of whether [they were] false or not.'" *Id.* at 615 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964)). It was apparently for this reason that the bankruptcy court granted summary judgment in the Wheelers' favor, on the theory that the state-court judgment

"necessarily encompassed a finding that Laudani acted willfully and maliciously." 783 F.2d at 611. The district court affirmed, but the Sixth Circuit reversed, explaining as follows:

> The intentional tort of libel meets the requirements of § 523(a)(6) for nondischargeability when the debtor/author knows the published statements were false. *In re Kasler*, 611 F.2d 308, 310, 311 (9th Cir.1979). Mere reckless disregard for the truth or falsity of the statement, which can support a libel verdict, is not a willful and malicious injury for purposes of § 523(a)(6). *Id.; In re Pereira*, 44 B.R. 248 (Bankr.D.Mass.1984).

*Id.* at 615.

The foregoing passage lends itself to two plausible interpretations. On the one hand, *Wheeler* may be asserting that "mere reckless disregard" as to the accuracy of a defamatory statement is inconsistent with a finding of *willfulness*. *See In re Grim*, 104 B.R. 486, 489 (Bankr.S.D.Fla.1989) (favorably citing *Wheeler* and opining that "knowledge of falsity ... constitutes willful conduct"). On the other hand, *Wheeler* may simply stand for the proposition that such disregard is not *malice*. *See In re Goidel*, 150 B.R. 885, 888 (Bankr.S.D.N.Y.1993) (citing *Wheeler* in support of the assertion that "[m]alice ... is established if the [debtor] knew [the defamatory statement] was false when made").

Unfortunately, reference to the two cases cited by *Wheeler* in the quoted excerpt provides no insights regarding this ambiguity because they contradict one another. *Compare Kasler*, 611 F.2d at 310–11 ("'[W]illfulness' denotes that the speaker knew his statements were false.") *with Pereira*, 44 B.R. at 251 ("Malice ... means that the author knew the statements made were

---

2. It is now generally accepted that § 523(a)(6) does not require a finding that the debtor specifically intended to cause the nondebtor's injury. *See Hartley*, 874 F.2d 1254 (vacating the 8th Circuit's panel decision and affirming the district court's judgment of nondischargeability); *Vulcan Coals v. Howard*, 946 F.2d 1226, 1229 (6th Cir. 1991); *Perkins*, 817 F.2d at 393–94; *Wheeler*, 783 F.2d at 615; *In re Kemmerer*, 156 B.R. 806, 808 (Bankr.S.D.Ind.1993); *In re Kaperonis*, 156 B.R. 736, 739, 24 B.C.D. 845 (Bankr.S.D.N.Y.1993);

*In re Woolner*, 109 B.R. 250, 254 (Bankr. E.D.Mich.1990); *In re Rice*, 18 B.R. 562, 564 (Bankr.N.D.Ala.1982). *But see In re Robinson*, 987 F.2d 665, 669 (10th Cir.1993). But even if one accepts the premise that a specific intent to injure must be proven, it would be more appropriate to incorporate that requirement into the standard for malice, rather than framing the issue in terms of whether the debtor acted "willfully." *See supra* n. 1.

false."). For the reasons which follow, however, I believe that *Wheeler* held that reckless disregard of the truth is relevant only to the malice inquiry.

Implicit in the proposition that reckless disregard for the truth evinces non-willful conduct is the premise that the allegedly "willful and malicious" act is the publication of a *false* defamatory statement.[3] And as will be explained below, I do not believe that the Sixth Circuit would endorse such a view.

In cases involving libel or slander, the act which results in injury is, by definition, the publication of a defamatory statement. *See, e.g., Rouch v. Enquirer & News of Battle Creek,* 440 Mich. 238, 251, 487 N.W.2d 205 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993) (*"Rouch II"*) ("A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." (citation omitted)); *Locricchio v. Evening News Ass'n,* 438 Mich. 84, 115, 476 N.W.2d 112 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992) ("[A] defamatory communication [is] one which … 'harm[s a person's] reputation.'" (citation omitted)). And just as a gunshot victim's chances of survival are not dependent on whether he was the assailant's intended target, a statement's potential for damaging a person's reputation is not necessarily a function of its veracity. For example, there is no reason to assume that a politician's career will be less damaged by a newspaper article describing him as an alcoholic if the assertion were accurate than if it were totally unfounded. *Cf. Wilson v. Scripps–Howard Broadcasting Co.,* 642 F.2d 371, 376 (6th Cir.), *cert. dismissed,* 454 U.S. 1130, 102 S.Ct. 984, 71 L.Ed.2d 119 (1981) ("In libel and slander cases generally, there is no particular causal connection between the proved fact (the making of a derogatory statement) and the presumed fact (the falsity of the statement). There is no particular reason to presume falsity.").

This basic principle is recognized by the law on slander and libel. That the defamatory statement happens to be true will generally render the publication not actionable, but it does not render it any less defamatory— i.e., injurious. *See, e.g.,* 50 Am.Jur.2d *Libel and Slander* § 173. A simple hypothetical will demonstrate why falsity of the published statement should not be incorporated into the definition of the injurious act in cases brought under § 523(a)(6).

Assume D, a white person working for a small company whose owner has a well-known policy of firing any employee whom he discovers is unfaithful to his or her spouse, learns that P, who is black, is a leading candidate to fill a vacancy in the office where D works. D is a racist and, not knowing or caring whether it is true, decides to "inform" the owner that P is an adulterer as a means of insuring that P is not hired. The ploy works, but P discovers what D did and sues him for defamation. The court finds that the defamatory statement is false, and that D's action was motivated solely out of racial animus. Judgment is rendered in favor of P, and D files for bankruptcy. P promptly files a complaint for a determination that the debt owed to him is nondischargeable under § 523(a)(6).

If the standard to be applied to the foregoing facts is whether D acted willfully in publishing *a false* defamatory statement about P, then P would almost surely lose his nondischargeability action. After all, D did not know (or care) whether P was in fact an adulterer: D's only concern was that P not get the job offer from D's boss. And since D was merely reckless about the truth or falsity of the statement, the court's conclusion under this standard would have to be that the debt in question did not arise from willful misconduct on D's part, and is therefore dischargeable.

The point that must be emphasized about such an outcome is that by mischaracterizing the injurious act, the court reaches a result that is analytically wrong. Just as the act of firing a loaded weapon into a crowd of people

---

3. After all, there was no doubt in *Wheeler* that Laudani intentionally, i.e., willfully, distributed the defamatory document. Willfulness was an issue in that case only if the offensive act is defined as the distribution of a document containing false defamatory statements.

cannot properly be described as anything but willful, there is no sound basis for concluding that D's conduct was somehow less than willful.[4] Yet that is exactly the conclusion a court would reach if it were to define the injurious act as the publication of a *false* defamatory statement.

I am therefore confident the Sixth Circuit would agree that under the willfulness element of § 523(a)(6), the inquiry is whether the debtor intentionally published a defamatory statement, rather than a false defamatory statement. And since the debtor's knowledge that a defamatory statement was true or false neither proves nor disproves that it was intentionally published, it is unlikely that *Wheeler* meant to suggest that reckless disregard for the truth is inconsistent with a finding of "willfulness," particularly since the court defined that term without incorporating malice as a requirement. *See supra* n. 1. Rather, when *Wheeler* indicated that "reckless disregard for the truth or falsity of the statement ... is not a willful and malicious injury," 783 F.2d at 615, it presumably meant only that under such circumstances the debtor has not acted *maliciously.*

That being the case, it would seem that *Wheeler* stands for the proposition that a debtor does not act maliciously under § 523(a)(6) unless he knowingly published a false defamatory statement. *See In re Durrance,* 84 B.R. 238, 239, 17 B.C.D. 684 (Bankr.M.D.Fla.1988) (citing *Wheeler* as supporting the assertion that defamation damages may be nondischargeable under § 523(a)(6) "as long as the Debtor knew the published statements were false"). Indeed, Thompson specifically argued that *Wheeler* should be so construed. *See* Defendant's Post Trial Brief at pp. 30, 36, 40–41. For a number of reasons, however, I reject this interpretation.

In the foregoing hypothetical, such a rule would compel the conclusion that D's action was not malicious, since D did not know that the defamatory statement was untrue. I see

no justification for that conclusion. As mentioned *supra* p. 750, one requirement for a finding of malice is that the actor knew that harm was "substantially certain" to result from his act. D would be hard-pressed to argue that that element is not satisfied under the posited facts.

Similarly, I do not think that any court could properly conclude that there was "just cause or excuse" for D's action, the second prong of the malice test. Because D's "cause"—to exclude blacks from his place of employment—was anything but "just," the only plausible basis for such a conclusion would be that D's action is excused by the fact that he did not know his statement was false.

But even this reasoning makes little sense because reckless disregard for the truth actually tends to *negate* the contention that a debtor's publication of a defamatory statement was excusable, and hence not malicious. *Cf.* 50 Am.Jur.2d *Libel and Slander* § 184 ("The element of legal malice is found in the negligence and *recklessness* of the defendant's acts." (emphasis added)). By setting up what amounts to an irrebuttable presumption that a debtor who did not lie (i.e., knowingly publish a false statement) has not acted maliciously, the rule which *Wheeler* arguably embraced would permit debtors who have engaged in the most egregious kinds of misconduct to avoid debts that are clearly within the scope of § 523(a)(6).

In short, requiring a finding that the debtor knew his defamatory statements were false in order to demonstrate malice is illogical and can lead to patently unjust results. *Wheeler* did not explicitly impose such a requirement, and a closer look at that case suggests a more reasonable interpretation of the court's holding.

In *Wheeler,* the only issue was whether a state-court finding of reckless disregard for the truth entitled the Wheelers to summary judgment.[5] The Wheelers apparently did

4. As *Wheeler* itself noted, defamation is an *intentional* tort. *See* 783 F.2d at 615. It therefore is anomalous to rule that the act taken by D was not willful (i.e., that it was unintentional). This incongruity is avoided if the court defines the

injurious act in a way that is both intuitive and consistent with the definition of a defamatory statement.

5. Since the record was unclear as to whether the state-court verdict included a finding that Lauda-

not rely on any other evidence to support their motion. Thus the court was not presented with the question of whether reckless disregard, along with other indicia of the debtor's malevolence, could support a finding of malice.

■ *Wheeler* can therefore appropriately be construed as standing for the proposition that a showing by the plaintiff that the defendant was reckless with regard to the accuracy of a defamatory statement that he published is, *without more,* insufficient to demonstrate that the defendant acted maliciously: The decision leaves open the possibility that other evidence tending to disprove the defendant's claimed (or assumed) good intentions may satisfy § 523(a)(6)'s malice standard.[6]

So interpreting *Wheeler* leads to far more sensible results than the alternative interpretation. In the racist-debtor scenario, for example, the fact that D recklessly disregarded the truth or falsity of the defamatory statements, *in conjunction with* other evidence that D's action was racially motivated, would support a finding of malice without running afoul of *Wheeler,* as I interpret that case.

What must also be emphasized is that *Wheeler* held only that reckless disregard for the truth is *insufficient* to support a finding of malice: it did not state that recklessness is *necessary* to such a finding. "Actual malice" (of which reckless disregard for the truth is one species),[7] while often essential to a determination of *liability* in defamation cases, is not essential to a determination of *nondischargeability* under § 523(a)(6). Thus if there is sufficient evidence to find that the debtor acted purely out of malice—in the

§ 523(a)(6) sense of that term—then a conclusion that the action is within the scope of § 523(a)(6) is appropriate, even in the absence of "actual malice."[8]

To illustrate why it is unsound to require actual malice for purposes of § 523(a)(6), one need only change the facts of the racist-debtor hypothetical such that D reasonably (but incorrectly) believed that P was committing adultery. It would be folly to suggest that, because P cannot prove "actual malice" (since D was not reckless), the court is precluded from making a finding of malice under § 523(a)(6) based on other evidence that D's motive was wrongful.

Accordingly, Merritt did not need to prove that Thompson *knew* he hadn't molested Kaitlen, or recklessly disregarded that fact, when she made the defamatory statements at issue here in order to establish malice on Thompson's part. Pursuant to *Wheeler,* however, proof that she made the statements with reckless disregard as to whether they were true or false, without more, does not prove malice.

## B. Application to Facts

It is undisputed that Thompson willfully, i.e., intentionally, published statements accusing Merritt of abusing Kaitlen, and I so find. I also find that Thompson knew that the statements were substantially certain to harm Merritt. The last consideration under § 523(a)(6), and the only one which Thompson seriously contested, is whether there was just cause or excuse for making the statements. In addressing this question, I analyze the statements to the authorities separately from those made to McClellan.

ni knew the defamatory statements were false, the Sixth Circuit in effect assumed that, for purposes of determining whether summary judgment was properly granted, the verdict established only that Laudani was reckless as to the accuracy of the statements. *See Wheeler,* 783 F.2d at 615–16.

6. The probative weight of Laudani's recklessness goes more to the question of his motives than to whether he was aware of the likelihood of harm resulting from distribution of the defamatory document. I therefore presume that the concern in *Wheeler* was whether the state-court verdict established that Laudani acted without "just

cause or excuse," the other prong of the two-part malice test.

7. As indicated earlier, "actual malice" exists if the defamatory statement was published with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

8. This assumes that the debtor acted willfully in publishing the defamatory statement. That will not be an issue in most defamation cases, as defendants generally do not argue that the defamatory statement was published inadvertently.

### i. Statements to Authorities

On three separate occasions—October 1, 1989, February 18, 1990, and April 29, 1990—Thompson advised a nurse at the McPherson–McAuley Urgent Care medical facility that she suspected Merritt had abused Kaitlen. On several occasions between October, 1989, and May, 1990, Thompson reported to Stacey A. Lytle, an investigator at Protective Services, that Merritt had sexually abused Kaitlen. Thompson also sent a letter to Lytle's supervisor, Gordon J. Dobis, in which she detailed her suspicions regarding Merritt. Exhibit L–1.

On February 15, 1990, and on several occasions thereafter, Thompson indicated to health care professionals at the University of Michigan Center for the Child and Family that she believed Merritt was physically, including sexually, abusing Kaitlen. The professionals to whom Thompson spoke included Missi Nadeau, a psychologist intern, and Dr. Neil Kalter, a clinical psychologist.

In May and June of 1990, Thompson told Judith Ashin, a psychologist/social worker/family counsellor affiliated with Huron Valley Consultation Center in Ann Arbor, Michigan, that she believed Merritt was abusing Kaitlen. In her conversations with Ashin, as well as in making the other reports cited above, Thompson provided specific information supporting this belief.

The record also shows that Thompson complained to the Michigan State Police, the office of the Friend of the Court, and various other public officials, to the effect that Merritt may have abused Kaitlen.

The characteristic which is common to the persons Thompson contacted on the occasions described above is that each had a legitimate and self-evident need to know about suspected child abuse. Such abuse can of course have devastating physical and emotional effects, and consultation with appropriate medical and behavioral specialists is essential for the child's well-being. It is also important that child abuse be reported to law enforcement personnel and, in this case, the Friend of the Court, as their involvement is necessary to ensure that the perpetrator is brought to justice and that the abuse does not continue. Thus if Thompson truly suspected that Merritt was abusing Kaitlen, then she had just cause or excuse for contacting these authorities.

There is a good deal of indirect evidence to suggest that Thompson's suspicions were not genuine. Although Thompson testified that she did not hate Merritt, the parties were regularly locking horns. After Thompson became pregnant with Kaitlen, Merritt told her that he would not marry her. He also asked her to abort the pregnancy and to keep the matter quiet. Thompson sued Merritt in 1987 to establish that he was Kaitlen's father and to obtain an order requiring him to pay child support. Merritt subsequently left the state, abandoning Thompson and the baby. Upon his return to Michigan, there commenced ongoing, bitter litigation over sundry family-law issues, including Merritt's visitation rights, medical insurance for Kaitlen, and the appropriate level of child support.

Based on the parties' history of confrontation and their testimony taken as a whole, I am convinced that there was a strong mutual antagonism between Merritt and Thompson that predated the charges of child abuse. Thompson therefore had a motive for intentionally making false accusations against Merritt.

The circumstances surrounding Thompson's first report of child abuse suggests that she was indeed trying to frame Merritt. According to Thompson's testimony, she brought Kaitlen to McPherson–McAuley Urgent Care on October 1, 1989, because there were "fingermark" bruises in the area immediately surrounding the child's anus. *See also* Exhibit L–1, p. 2. However, no medical witness reported seeing—or even hearing about—bruises of that type, and the detailed medical record of the visit makes no mention of such bruises.[9] Instead, the nurse and

---

9. In attempting to explain this absence in the medical record, Thompson argued that the Urgent Care nurse testified that Kaitlen's anus was not examined. *See* Defendant's Post Trial Brief at p. 11 n. 2. But this is incorrect. The nurse actually testified that, while she did not recall whether she personally conducted such an exam, she was certain that the physician on duty would

doctors who examined Kaitlen found numerous contusions on Kaitlen's legs, buttocks and lower back that they determined to be several days old. *See, e.g.*, Exhibit M, p. 2; Exhibit 16, p. 2. Contrary to Thompson's assertion, then, I do not think that Kaitlen had any bruises in the anal area when this visit was made.

The foregoing facts admit of at least two plausible explanations. October 1, 1989, was a Sunday, and Kaitlen had just returned from a weekend visit with Merritt. Thus it may be that Thompson timed the Urgent Care visit so that it would look like the bruises described in the medical record had been inflicted by Merritt.[10] Because the age of the bruises was documented, however, they could not be linked to Merritt, and Thompson's scheme was foiled. She then resorted to plan B, which was to concoct a story after the fact about "fingermark" bruises that never existed.

A benign interpretation of the same facts is that Thompson either did not notice the bruises on Kaitlen's lower back and buttocks until the day of the Urgent Care visit,[11] or that she did know about them days prior to the visit but had no intention of manipulating the timing of the visit to implicate Merritt. Her subsequent contention that the visit was prompted by fingermark bruises around Kaitlen's anus may simply reflect confusion on Thompson's part as to when these bruises first appeared.[12]

Indirect support for the more sinister interpretation of these events is provided by Thompson's testimony on other matters, which suggested that she was not being truthful. In a letter to Merritt dated February 16, 1989 (actually 1990), she stated that she "noticed that after Katie [Kaitlen] has a weekend visitation at your house, her vagina/anal area is red and irritated." Exhibit CC. At trial, Thompson claimed not to remember if she suspected sexual abuse when she wrote this letter. But she conceded that she could think of no other explanation for the irritation. And the record is replete with allegations made by Thompson before the date of the letter, to the effect that Merritt was sexually abusing Kaitlen. Thus Thompson's professed memory lapse concerning her state of mind at the time the letter was written is suspect.

Thompson's second visit to Urgent Care was on Sunday, February 18, 1990, at about 9:30 p.m. This visit, like the first, was made after Kaitlen had been with Merritt over the same weekend. In explaining her decision to have Kaitlen subjected to a medical examination so late in the day, Thompson cited a letter written by Merritt in response to the letter Thompson wrote on February 16, 1990. Merritt advised Thompson in this letter that as his wife was getting Kaitlen ready for bed "she noticed (upon specific examination) a redness in the vagina area and speculated that she might have had some type of infection." Exhibit C.

The problem with this explanation is that, although Thompson stubbornly refused at trial to recognize it, Merritt's letter clearly referred to events occurring during a visit with Kaitlen that took place on the weekend of January 19, 1990, a month before the second Urgent Care visit. *See* Exhibit C. No parent with common sense would drag a three-year old out of the house late in the evening for a medical evaluation simply to

---

have done so if indeed Thompson had voiced concern about these bruises. So it appears that if no examination of the anal area was performed during the Urgent Care visit, it was only because Thompson made no mention of the mysterious "fingermarks."

10. That is the theory advanced by Merritt in a letter to Lytle dated November 8, 1989. *See* Exhibit L-1, doc. 4, p. 3 ("Ms. Thompson full well knew of any injuries to Katie [Kaitlen] prior to my picking her up on Friday and when I or my wife failed to note same to her, seized upon this as any [sic] opportunity to 'document' abuse while in my custody.").

11. At trial, Thompson said that the bruises on the child's legs were from an accident earlier that week. *See also* Exhibit 25, p. 3 (letter from Thompson to Lytle dated October 28, 1989).

12. Thompson's babysitter also claimed that there were fingermark bruises near the child's anus. *See* Exhibit HH p. 8:1–10. But the babysitter was unsure as to when she first noticed these bruises, and in any event described the bruises as being "[o]utside the crevice area" of the buttocks. *Id.* at p. 12.

"follow up" on secondhand information which is neither current nor implicates a problem requiring immediate attention. Thus whatever the reason for the timing of the second visit to Urgent Care, I do not believe it was the one proffered by Thompson.

If the record contained only the matters discussed thus far, I would be inclined to hold that Merritt proved Thompson was trying to fabricate a case against him. But there are a number of considerations which lead me to conclude that Merritt has not met his burden of proof with regard to the sincerity of Thompson's suspicion that Merritt was abusing their daughter.

For instance, while Merritt was not prosecuted and Protective Services could not substantiate Thompson's claim that Kaitlen had been sexually abused, none of the authorities with whom Thompson consulted ever advised her that Kaitlen was not being abused. To the contrary, Ashin testified that Thompson was warranted in suspecting sexual abuse, and that she had so advised Thompson. With regard to the investigation results, Thompson was told only that the evidence of sexual abuse was "inconclusive," and that she should remain vigilant for other signs that Kaitlen was being mistreated.[13]

One such sign was reported to Thompson by a worker at a day care center on Febru-

ary 5, 1990, the day after Kaitlen had been visiting with Merritt. According to the worker, Kaitlen had an unusual and painful diarrhea during which a "thick whitish semen like substance [came] out of her rectum." Exhibit 3, pp. 2 and 25; Exhibit L–1, doc. 1, p. 2.[14] Also, Kaitlen's babysitter told Thompson that Kaitlen had said that Merritt had taught her to masturbate. Exhibit HH, pp. 6–7.

Another sign of sexual abuse surfaced during one of Kaitlen's therapy sessions with Nadeau. On August 29, 1990, Kaitlen told Nadeau that Merritt "pulled at her dress and her panties showed and that [Merritt] had hurt her." Exhibit AA. Ashin's testimony also implied that Kaitlen made accusations against Merritt on several occasions, and Lytle expressed "concern[ ] that Kaitlen might be making statements [complaining about Merritt] to her mother." Exhibit M.[15] Thus Thompson had reason to be concerned about sexual abuse.[16]

Moreover, while sexual abuse was never confirmed, there was a strong basis for concluding that Kaitlen had indeed been physically abused. In the investigation conducted by Protective Services following Kaitlen's first visit to Urgent Care, Lytle reported that "there is credible evidence to suggest that some abuse likely occurred to Kait-

13. Nadeau testified that on May 10, 1990, she indicated to Thompson that Kaitlen "didn't look like an abused child." But if this comment was intended to get the message across to Thompson that there was no basis for suspecting child abuse, then I think it was far too tepid.

14. If the secretion did in fact contain semen, then Thompson would have had definitive evidence of sexual abuse, and she may also have been able to have the perpetrator identified through DNA testing. Inexplicably, however, when the caregiver asked Thompson whether "she should save a sample" of the secretion, Thompson told her that it "was not necessary." Exhibit 3, p. 25.

15. Ashin testified that Kaitlen's accusations were made only in her mother's presence, and were retracted when Thompson was not present. Because Ashin attached equal weight to the accusations and the retractions, the net probative effect of the incriminating statements was essentially zero from Ashin's standpoint.

Lytle thought that Kaitlen might simply be saying what "she feels her mother wants to

hear." Exhibit M. But several of the experts in psychology testified that they did not believe Thompson coached Kaitlen to say bad things about her father, nor is there persuasive evidence that such was the case. And while Thompson may have been subconsciously influencing the kind of feedback she got from Kaitlen, it is entirely understandable that Thompson's "conscious" would take Kaitlen's remarks very seriously. Ashin acknowledged this very point, testifying to the effect that Thompson was reasonable in suspecting Merritt based on Kaitlen's statements, even if the child was simply trying to please her mother by projecting evil onto Merritt.

16. Merritt himself apparently shared Thompson's concern. In a letter dated February 17, 1989 (actually 1990), Merritt told Thompson that during a visit over the weekend of January 19, 1990, Kaitlen had complained to Merritt's wife of pain in her pubic area. Merritt implied in this letter that Kaitlen had attributed the pain to sexual abuse committed by Thompson's ex-husband. Exhibit C.

len. . . . Both doctors stated that the bruises were unlikely to be accidental." Exhibit M, p. 5. *See also* Exhibit B (correspondence from Lytle to Merritt informing the latter that "[t]he case was substantiated as a case of abuse"). And Ashin testified that Kaitlen's symptoms were consistent with a child who might have been abused.

Nor would it be wholly unreasonable for Thompson to suspect that it was Merritt who was physically abusing Kaitlen. Even though Protective Services explicitly concluded in its investigation that the identity of the perpetrator could not be determined, Exhibits M and B, and the bruises noted during the first visit to Urgent Care were too old to be attributable to her weekend visit with Merritt, Kaitlen did tell Lytle during the course of the investigation that Merritt "is a bad person" and that Merritt hurt her and hit her. Exhibit M, p. 3. According to her babysitter, Kaitlen would often "fight tooth and nail and we would have to force her to go" to Merritt when he came to get her. Exhibit HH, p. 9.

Thus there were objective grounds for suspecting that Merritt was abusing Kaitlen.[17] I am also impressed by the fact that the behavioral specialists, one of whom was Merritt's own witness, generally conceded that Thompson was sincere in her belief that Merritt may have been abusing Kaitlen.

For example, Dr. Kalter, who was called as a witness by Merritt, testified that Thompson's allegations were not designed "to get" Merritt, but were made because she believed they were true. Similarly, Nadeau testified that she believed Thompson was sincere and genuinely worried about the welfare of Kaitlen.

Ashin reached the same conclusion as Nadeau and Dr. Kalter. She testified that Thompson was experiencing tremendous conflict over her suspicion about Merritt's behavior while at the same time allowing the child to continue visitation with him. Ashin was sure that Thompson was sincere and concerned about Kaitlen. She did not believe that Thompson was feigning suspicions about abuse just to hurt Merritt.

Finally, I note that Lytle described Thompson as "appear[ing] to have a great deal of concern for the safety and well-being of her daughter." Exhibit M, p. 5. A report made by Lytle reflects her personal belief in Thompson's sincerity: "This worker has no doubt that Mrs. Thompson is concerned for her daughter's well-being and feels she is doing what is best for her. . . . This worker is not suggesting that Mrs. Thompson has made this situation up and feels that she is genuinely concerned that something may have happened to [Kaitlen] at Mr. Merritt's home." *Id.*

---

**17.** I am considering the objective evidence only for purposes of determining whether Thompson sincerely believed in the substance of her allegations. *Cf. In re Braen*, 900 F.2d 621, 628 (3d Cir.1990), *cert. denied*, 498 U.S. 1066, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991) ("If the known facts fall so short of probable cause [for filing a criminal complaint] that a person of common prudence would recognize its absence, one may infer that the defendant recognized its absence and [acted] with an ulterior motive."); *In re Premo*, 116 B.R. 515, 533 (Bankr.E.D.Mich.1990) (A party's contention that he did not have personal knowledge of a particular fact can "simply [be] discredit[ed]" if the objective evidence demonstrates that it is "too implausible.").

I reject Merritt's argument that there can be no just cause or excuse for Thompson contacting the authorities unless her suspicions were reasonable. After all, it is widely accepted that "willful" conduct under § 523(a)(6) does not include injury-producing actions which are negligent rather than intentional. *See, e.g., In re*

*Posta*, 866 F.2d 364, 367 (10th Cir.1989); *In re Scarlata*, 127 B.R. 1004, 1013 (N.D.Ill.1991), *aff'd*, 979 F.2d 521 (7th Cir.1992) (collecting cases). And if negligent *actions* are not sufficiently blameworthy for purposes of § 523(a)(6), then I see no reason why the same result should not obtain with respect to negligent *decisionmaking* that leads to the (intentional) commission of the injurious act. It makes little sense, for example, to draw a moral distinction between a surgeon who negligently performs a medical operation and a surgeon who performs the operation competently but who was negligent in determining that the operation was necessary. I therefore subscribe to the view that § 523(a)(6)'s malice requirement is targeted at evil behavior, not faulty cognitive abilities. *See Braen*, 900 F.2d at 626–28. *But see In re Johnson*, 109 B.R. 885, 893 (Bankr.N.D.Ind.1989).

In any event, the contention that a debtor's good-faith belief must be reasonable would not advance Merritt's position, because I do not think that Thompson's suspicions were unjustified.

For the reasons discussed earlier, Thompson was not a very credible witness. Consistent with the prevailing view, however, I believe that she was truthful when she testified to the effect that her reports to the authorities were motivated by genuine concern that Merritt was abusing Kaitlen.

Given the pre-existing animosity between the parties, it is likely that Thompson took a certain amount of pleasure in making Merritt's life miserable. But purity of purpose is not a requisite for avoiding a determination of nondischargeability under § 523(a)(6): pursuant to the decisions of the Sixth Circuit in *Perkins* and *Wheeler*, the inquiry is whether the debtor had a good reason for committing the injurious act, not whether she had a bad reason.

Defining the malice inquiry in positive terms also makes sense as a matter of policy. Assume, for example, that A and B are next-door neighbors who have bitterly feuded for months over the location of a fence dividing their properties. A discovers one day that someone has shot out the windows of his car, and there is hard evidence suggesting that B was the culprit. Under such circumstances, civilized persons would agree that A should initiate criminal and/or civil proceedings against B. But if a debtor's action must be devoid of any taint of ill will or spite in order to be "justified" for purposes of § 523(a)(6), then any such response on A's part would likely be deemed malicious and could result in nondischargeable liability. This elevated standard is unrealistic—people are not often motivated by purely noble intentions—and discourages behavior that society should wholeheartedly endorse.

Of course, a court may infer from the existence of a bad motive that there was no good reason for the debtor's action. But as the foregoing hypothetical suggests, that inference is not always appropriate. And in this case I think Thompson acted for both a good reason (to protect Kaitlen and/or bring the perpetrator to justice) and a bad reason (to cause Merritt grief).

Reference to employment discrimination cases is helpful in determining how a court should analyze situations where, as here, the evidence suggests that the defendant had "mixed motives" for taking the challenged action. In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268, 283 (1989), the Court stated in a plurality opinion that "an employer shall not be liable [under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*] if it can prove that, even if it had not taken gender into account [in making an employment decision], it would have come to the same decision regarding a particular person." If I utilize this approach, the critical question is whether Thompson would still have made the reports of child abuse had she not had a grudge against Merritt.

Another approach is to consider whether the injurious action would have been taken if the legitimate reason had not been a factor. This alternative approach examines the significance of the debtor's positive motivation, rather than his negative motivation, and therefore better serves the court's task of determining whether there was any justification for the offensive act. Under this analysis, the pertinent question is whether Thompson would have reported Merritt if she did not believe in the truth of her accusations.

I need not choose between these alternatives, however, because Thompson passes muster under either standard: The evidence leads me to conclude that Thompson would not have contacted the authorities unless she honestly thought that Merritt had abused Kaitlen, and that she would have done so even if the parties had been on good terms. Since she had just cause or excuse for defaming Merritt, I hold that Thompson did not act "maliciously" in reporting her suspicions of child abuse to the authorities.

This conclusion is contrary to the one reached in *In re Bryl*, 156 B.R. 5 (Bankr. D.N.H.1993). In that case, the debtor had secreted her children from her former husband because she believed he was sexually abusing them. The former husband, who had been exonerated of charges of abuse, sued the debtor for a determination that the debt owed to him for costs incurred in locating the children was excepted from discharge by § 523(a)(6). The court ruled for the plaintiff even though it was of the opinion

that the debtor "probably believed subjectively that the sexual abuse danger to her children existed" and that "her primary intent and motivation ... may well have been to protect her children." *Id.* at 7–8.

It is not clear whether this ruling is premised on the court's assumption that just cause or excuse is irrelevant to the question of malice under § 523(a)(6), or if instead the court believed that a finding of just cause or excuse cannot properly be made if the debtor had mixed motives—one good and the other bad—for committing the injury-producing act. *See id.* at 8 (defining willful and malicious conduct without reference to the just-cause-or-excuse requirement, but also noting "that there was and is malice in the ordinary sense of that word on the part of the debtor toward the plaintiff which would indicate that even if the injury to the plaintiff were [only] a secondary consideration in her thinking ..., it nevertheless was an intended and malicious injury").[18]

With respect to the relevance of just cause or excuse, it is well established in this circuit that such a finding negates malice for purposes of § 523(a)(6). *See supra* p. 750. Moreover, this rule is only logical. It is obvious, for example, that an individual who breaks into another person's hunting lodge to avoid freezing to death is not actuated by malice. *See also In re Routson,* 160 B.R. 595, 24 B.C.D. 1345, 1356 n. 11 (Bankr. D.Minn.1993). By definition, an act committed out of malice is "wrongful." *Black's Law Dictionary* (5th ed. 1979). Again by definition, an act which is wrongful is "unjust." *Id.* Thus the notion that an act can be both justified (i.e., motivated by just cause or excuse) and malicious is untenable.

As for the other rationale that may underlie the decision in *Bryl,* I believe for the reasons explained earlier that a debtor's conduct need not be saintly in order to be justi-

fied: if the debtor had a valid reason for taking the action in question, a finding of malice is generally inappropriate. Thus I disagree with *Bryl* to the extent that it meant to endorse either of the propositions discussed.

### ii. Statements to McClellan

In early 1991, the Detroit News ran a story written by McClellan to the effect that men are often falsely accused of sexually abusing their children. After that story was published, McClellan received a call from an unidentified man who suggested that she call Thompson to get "another point of view." Exhibit 31 (McClellan deposition, pp. 5:9–11; 15:13–17; 24:8–25:6). McClellan then contacted Thompson. After obtaining her attorney's consent, Thompson agreed to be interviewed.

In an article published in the March 25, 1991, edition of the Detroit News, McClellan summarized her conversation with Thompson as follows:·

> After one visit in October 1989, Thompson said her daughter told her Merritt had hurt her. While undressing the child for her bath, Thompson noticed bruises that led her to suspect sexual abuse.

Exhibit 2. Thompson herself conceded that "the obvious implication" of the foregoing passage was that Merritt sexually abused Kaitlen. Defendant's Post–Trial Brief at p. 19.

As discussed above, Thompson had a deep-seated hatred for Merritt. Given the obvious potential for harm to Merritt that could result from the interview and the foreseeable newspaper article based upon it, this animosity suggests that Thompson did not have a valid reason for "going public with her allegation of sexual abuse." [19]

---

18. The result in *Bryl* may also be attributable at least in part to the court's belief that the debtor's suspicions about her former husband were unreasonable. *See* 156 B.R. at 7 (referring to "the various hearings and trials and objective events that occurred beforehand [i.e., before the debtor absconded with the children] that should have led [the debtor] to questioning" her suspicion). But § 523(a)(6) does not apply to negligent con-

duct, *see supra* n. 17, nor were Thompson's doubts about Merritt unreasonable.

19. Of course, an individual's conduct may in some cases fully justify feelings of outrage and hostility toward that person. But Thompson—who denied harboring any such sentiments—did not suggest that publicizing her allegation was designed to serve as a form of retribution. In any event, I do not see how retaliation can con-

That Thompson sincerely and nonnegligently believed the allegation to be true does not justify her conduct. The decision to expose someone to widespread public scorn should be excused for purposes of § 523(a)(6) only if the debtor thought that a legitimate objective could thereby be served. *Cf. Fulghum v. United Parcel Service,* 424 Mich. 89, 106, 378 N.W.2d 472 (1985) (separate opinion by Levin, J.) ("An employer is not privileged to communicate *needlessly* to the world at large ... the reason for [an employee's] discharge if it is of a character that would hold the discharged employee up to opprobrium." (emphasis added)). And at least under the facts of this case, I believe that the revelation of a perceived truth is itself not a legitimate objective.

The article quoted Thompson as saying that "[s]omeday, my little girl is going to have [to] deal with this. I want to help her look at it and get on with her life." Exhibit 2. But Thompson did not assert at trial that she had her story published for Kaitlen's benefit. Nor would I would give any credence to such an assertion, inasmuch as Dr. Kalter specifically advised Thompson that she should keep the controversy private for Kaitlen's sake. The fact that Thompson ignored this advice, and even went so far as to permit a photograph of herself holding Kaitlen to accompany the newspaper article, leads me to conclude that she did not grant the interview out of concern for the best interests of her daughter.

In a brief filed after this matter was tried, Thompson's counsel stated that Thompson "agreed to the interview with the Detroit News because she believed that such publicity could result in a proper investigation that she felt was lacking." Defendant's Post–Trial Brief at p. 35. *See also id.* at p. 36 ("Because she honestly believed that her child may have been sexually abused while under Plaintiff's care, Defendant felt compelled to take whatever steps were necessary to have the Plaintiff fully and adequately investigated.").

Although the desire to spur a "proper investigation" may be a good reason for publicizing the parties' dispute, it could only serve as justification or an excuse for Thompson's statements to McClellan if it was truly Thompson's objective. *Cf. Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (In an employment discrimination action brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.,* "the plaintiff must ... have an opportunity to prove ... that the legitimate reasons [for the alleged discriminatory treatment] offered by the defendant were not its true reasons, but were a pretext for discrimination."). And I do not believe that Thompson gave the interview for the reason cited.

One problem with the explanation for the interview is that it is not particularly plausible. The likelihood that publicizing Thompson's accusation—the same one that she had already made to authorities—would result in a new or more thorough investigation into the charges seems remote. The likelihood that any such investigation would lead to a different determination regarding the validity of the charge seems even more remote. On the other hand, the likelihood that Merritt would suffer substantial embarrassment and distress from the publicity was very strong. Given this disparity in probabilities, the rationale offered is rather dubious.

But the major problem with the explanation is that it came from Thompson's counsel. Because Thompson herself never testified as to her motives, the inference I draw is that she did not have a valid reason for giving the interview. *See, e.g., In re Crabtree,* 39 B.R. 718, 724, 11 B.C.D. 1075 (Bankr.E.D.Tenn. 1984) ("When a party has exclusive knowledge of facts and fails to testify to them, ... a negative inference can be drawn against the party.").

█ Put simply, nothing in the record sufficiently rebuts Merritt's indirect evidence that Thompson had no just cause or excuse for publicizing the allegation of sexual abuse. Accordingly, I find that Thompson acted out

stitute just cause or excuse for purposes of § 523(a)(6). *Cf., In re Pokorny,* 143 B.R. 179,

182 (Bankr.N.D.Ill.1992).

of malice in disclosing the allegation to McClellan.[20]

## II. *Liability*

■ Having concluded that Thompson's decision to publicize her accusation was willful and malicious for purposes of § 523(a)(6), I must now decide if she is liable to Merritt for damages resulting from the publicity.[21] Whether or not one has a claim based on statements alleged to be defamatory is governed by Michigan law. *See Wheeler,* 783 F.2d at 615. Thus Thompson is liable to Merritt if: (1) she made a false and defamatory statement to McClellan about Merritt; (2) the communication was unprivileged; (3) she was guilty of "fault amounting to at least negligence" in publishing the statement; and (4) the statement specially harmed Merritt,

or is actionable even in the absence of special harm.[22] *Rouch II,* 440 Mich. at 251, 487 N.W.2d 205. *See also* Mich.Comp.Laws § 600.2911(7).[23]

Thompson bore the burden of proving that any defamatory statement she made was privileged. *See Lawrence v. Fox,* 357 Mich. 134, 144, 97 N.W.2d 719 (1959). Merritt had to prove that the challenged statement was published negligently or with some degree of fault greater than negligence. *See, e.g., Michigan Microtech v. Federated Publications,* 187 Mich.App. 178, 184, 466 N.W.2d 717, *app. denied,* 438 Mich. 873 (1991); *Postill v. Booth Newspapers,* 118 Mich.App. 608, 618, 325 N.W.2d 511 (1982). It is less clear whether Merritt also bore the burden of proving that the statement was false. *Compare Wilson,* 642 F.2d at 374–76;[24] *Locric-*

---

**20.** Since there is no basis for concluding that Thompson knew that Merritt was innocent of the charge or recklessly disregarded that fact, this case provides an example of a situation in which there is malice for § 523(a)(6) purposes despite the absence of "actual malice." *See supra* p. 754.

**21.** Whether Thompson is liable for the statements she made to the authorities is irrelevant, since I have already held that any such liability is not within the scope of § 523(a)(6), and is therefore dischargeable.

**22.** In lieu of "special harm," some courts use the term "special damages." *See, e.g., Pfeiffer v. Haines,* 320 Mich. 263, 268, 30 N.W.2d 862 (1948); *Clair v. Battle Creek Journal Co.,* 168 Mich. 467, 473, 134 N.W. 443 (1912). According to one treatise, "special damages" refers to "the loss of something having pecuniary value," and includes emotional distress only to the extent that the distress has "pecuniary consequences." D. Dobbs, 2 *Law of Remedies* § 7.2(3) n. 8 and accompanying text (2d ed. 1993) (citation omitted); *see also* D. Dobbs, *Remedies* § 7.2 (1973) (collecting cases). One court arguably suggested that Michigan does not adhere to this definition insofar as it excludes emotional distress. *See Hall v. Citizens Ins. Co. of America,* 141 Mich. App. 676, 686, 368 N.W.2d 250 (1985) ("[T]he terms 'special harm' or 'special injury' ... include[ ] not only out-of-pocket losses, but also damages for mental and emotional suffering."). To reconcile *Hall* with other cases dealing with the issue, I assume that *Hall* refers only to *pecuniary* damages caused by emotional distress, rather than to damages awarded for emotional distress as such. *See Sias v. General Motors Corp.,* 372 Mich. 542, 551, 127 N.W.2d 357 (1964) ("If the plaintiff is able to show a particu-

lar pecuniary loss ..., he may recover for the special harm thus caused....") (citation omitted); *Michigan Microtech v. Federated Publications,* 187 Mich.App. 178, 187–88, 466 N.W.2d 717, *app. denied,* 438 Mich. 873 (1991) ("Special damages ... are losses having economic or pecuniary value."); *Iacco v. Bohannon,* 70 Mich.App. 463, 467, 245 N.W.2d 791 (1976) (Special damages are "damages of a pecuniary nature").

**23.** Section 600.2911(7) provides that "[a]n action for libel or slander shall not be brought based upon a communication involving a private individual unless the defamatory falsehood ... was published negligently."). In cases involving media defendants, this rule is constitutionally mandated. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). Whether the holding in *Gertz* applies to non-media defendants like Thompson has not been settled. *Compare, e.g., Moss v. Stockard,* 580 A.2d 1011, 1022 n. 23 (D.C.App.1990) [*and* ] *Henry v. Halliburton,* 690 S.W.2d 775, 783 (Mo. 1985) (*Gertz* applies) *with, e.g., Greenmoss Builders v. Dun & Bradstreet,* 143 Vt. 66, 461 A.2d 414, 418 (1983), *aff'd on other grounds,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), *overruled on other grounds by Lent v. Huntoon,* 143 Vt. 539, 470 A.2d 1162, 1170 (1983) [*and* ] *Schomer v. Smidt,* 113 Cal.App.3d 828, 833, 170 Cal.Rptr. 662 (Cal.Ct.App.1980), *overruled by Miller v. Nestande,* 192 Cal.App.3d 191, 200 n. 7, 237 Cal. Rptr. 359 (Cal.Ct.App.1987) (*Gertz* does not apply). *Cf. Dairy Stores, Inc. v. Sentinel Publishing Co.,* 104 N.J. 125, 516 A.2d 220, 235 (1986) (*New York Times* protection extends to media sources).

**24.** After noting that the Supreme Court in *"Gertz* left states free to adopt any rule of liability concerning private plaintiffs so long as 'they do not impose liability without fault,' " *Wilson,* 642 F.2d

*chio,* 438 Mich. at 116, 476 N.W.2d 112 [*and* ] *Duran v. Detroit News,* 200 Mich.App. 622, 633, 504 N.W.2d 715 (1993) (implying that the plaintiff always bears the burden of proving falsity) *with Rouch II,* 440 Mich. at 252, 487 N.W.2d 205 [*and* ] *Rouch v. Enquirer & News of Battle Creek,* 427 Mich. 157, 203–04, 206, 398 N.W.2d 245 (1986) ("*Rouch I*") (implying a presumption of falsity unless the defamation involves a media defendant and a matter of public concern).

■ Assuming without deciding that Merritt had to prove he did not abuse Kaitlen, I conclude for the reasons which follow that he proved this and the other elements of his case by clear and convincing evidence. I therefore need not decide whether Merritt had to prove fault or falsity by this elevated standard, or by a simple preponderance of the evidence. *See Rouch II,* 440 Mich. at 252 n. 16, 487 N.W.2d 205 and accompanying text (indicating that in cases "involving a private plaintiff, a media defendant, and a publication regarding an area of public concern," the Michigan Supreme Court has not yet decided "whether the standard of proof with regard to falsity or negligence is 'clear and convincing evidence' or some lesser standard" (citation omitted)). Because Thompson failed to prove that her statements were privileged, each of the enumerated criteria is satisfied here.

## 1. False Defamatory Statement

As noted earlier, "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

*Rouch II,* 440 Mich. at 251, 487 N.W.2d 205 (citation omitted). Thompson's implicit charge that Merritt sexually abused Kaitlen obviously meets this definition, and is therefore defamatory. *See Royal Palace Homes v. Channel 7 of Detroit,* 197 Mich.App. 48, 52, 495 N.W.2d 392 (1992) ("Michigan recognizes the possibility of defamation 'by implication'...."). For the reasons which follow, I am also satisfied that the charge is false.

After reviewing the results of a State Police investigation and considering the Department of Social Services' reports, the Livingston County Prosecutor concluded that Thompson's allegations were unfounded. Based on numerous interviews with Kaitlen, Merritt, Thompson, and health care professionals, including experts to whom Thompson and Kaitlen were referred, Lytle issued a report, endorsed by Dobis, which stated that "there is still no credible evidence of abuse in this matter. To date there is no medical or social work professional that has stated they feel abuse has definitely taken place. There has not been one that has said that abuse has probably taken place." Exhibit M (Investigation report of an unsubstantiated complaint dated June 13, 1990). Ashin, one of Kaitlen's therapists, reported to Nadeau that Kaitlen "has not experienced sexual abuse and that it was unlikely that this had happened." Exhibit 3. Dr. Kalter testified that even though it was his statutory duty to file a report with Protective Services if he had the "slightest suspicion" that a child was being abused, he concluded that there was no need for such a report in Kaitlen's case. Indeed, the consensus among the authorities handling the case appears to be that Thompson's complaints against Merritt were frivolous.[25]

at 374 (quoting *Gertz,* 418 U.S. at 347, 94 S.Ct. at 3010, 41 L.Ed.2d 789), the Sixth Circuit concluded that "[f]alsity is an element of fault under the First Amendment that should be proved and not presumed." *Wilson,* 642 F.2d at 376. Because the question of *Gertz'* applicability to non-media defendants has not been resolved, *see supra* n. 23, it likewise is unclear as to whether the holding in *Wilson* applies to all private plaintiffs or only those suing a media defendant.

**25.** For example, Ashin noted that "the mother needs individual help and appears 'hysterical' over her child's normal development." Exhibit 3. She also told Nadeau that "Protective Services were fed up with Mikki [i.e., Thompson] and

tired of the whole case." *Id.* The notes taken by an intake worker at Protective Services described Kaitlen's referral from Urgent Care on April 29, 1990 in the following terms: "three year old at Dad for weekend visit—Ma *always thinks sex* abuse. Brought into Med clinic; had red anal area. Dr. said could be from not wiping properly—not concerned—called to cover ass. RS [referral source?] said Ma in every time kid visits ... Ma wanted it reported. RS felt Ma could be putting on setting this up." Exhibit 14 (Protective Services Referral Intake Questionnaire). It is perhaps unfortunate that the authorities' dim view as to the validity of Thompson's claims about Merritt was apparently never clearly expressed to Thompson.

It does appear that Kaitlen implicated Merritt in various statements that she made to her mother and others. But the experts who treated Kaitlen were generally skeptical about the reliability of these statements. *See supra* n. 15. And Merritt was very credible in categorically denying that he had ever mistreated Kaitlen. Taken as a whole, then, the evidence points strongly to the conclusion that Merritt never abused Kaitlen. Accordingly, I find that Thompson's accusation was false.

## 2. Unprivileged Communication

Thompson argued that her statements to McClellan were privileged in three respects. First, she claimed that she is immune from liability because the statements were essentially a summary of allegations that she made in state court. In support of this contention, Thompson cited Mich.Comp.Laws § 600.-2911(3), which states in pertinent part that "[d]amages shall not be awarded in a libel action for the publication ... of a fair and true report of matters of public record."

The quoted excerpt from § 600.2911(3) does not include slander, which is the basis for Merritt's complaint.[26] Nonetheless it seems that the Constitution affords the same kind of protection as § 600.2911(3) regardless of whether the defamation is oral or written. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975) (The First and Fourteenth Amendments preclude the States from imposing civil liability for "the publication of truthful information contained in official court records open to public inspection."). If *Cox,* which involved a media defendant, applies to this case, then it would appear that Thompson is correct in arguing that she can be held liable for defamation only to the extent that she provided McClellan with information that could not be gleaned from the public record of the state-court action.

However, Thompson overlooks an important distinction in making this argument.

There is a subtle but fundamental difference between saying "I testified at trial that X is a pervert" versus "X is a pervert." Because the latter assertion describes the speaker's present state of mind, it clearly goes beyond the simple recitation of a fact that can be verified by reference to court documents. And Thompson's statements to McClellan were more in the nature of a reaffirmation of her suspicions about Merritt, rather than a neutral account of allegations made in state court.

In any event, there is no evidence of any state-court litigation from which McClellan could have obtained the same information Thompson provided. Thompson's public-record argument is therefore unavailing.

Thompson also argued that she is entitled to partial immunity because Merritt is a public figure. The distinction between public and private persons is central to the question of whether a plaintiff must prove that the defendant acted with "actual malice" in publishing the defamatory statement—i.e., "with knowledge that [the defamatory statement] was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d 686. *See Wheeler,* 783 F.2d at 615 ("In an action for libel involving a public figure, ... Michigan courts follow the definition of 'actual malice' set forth in *New York Times....*"); *Rouch I,* 427 Mich. at 199–200, 398 N.W.2d 245 ("Under the *New York Times* standard, as it has developed, a publication about a public official or public figure is privileged in the absence of malice."); Mich.Comp.Laws § 600.2911(6) ("An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false.").

Since malice is, by virtue of § 523(a)(6), essential to Merritt's case regardless of

---

**26.** Slander involves "[t]he *speaking* of ... defamatory words," whereas libel is "[a] method of defamation expressed by print, writing, pictures or signs." *Black's Law Dictionary* (emphasis added). Although the latter term is expanded for

purposes of § 600.2911 to "include[ ] defamation by a radio or television broadcast," Mich.Comp. Laws § 600.2911(8), that modification is irrelevant here.

whether he is a public person, the private-versus-public figure dichotomy would seem to have no independent significance here. But the kind of malice contemplated by § 523(a)(6) bears little resemblance to the malice which must be shown under *New York Times.*

As discussed earlier, a "malicious" act under § 523(a)(6) means one "which the actor knows is substantially certain to result in harm to another," and for which there is no "just cause or excuse." *Woolner,* 109 B.R. at 254. This definition differs from the *New York Times'* "actual malice" definition in both respects. First, "actual malice" is irrelevant to the question of whether the actor knew that the statement would harm another: a party might make a defamatory statement with "actual malice," yet not satisfy the "substantially-certain" element of malice under § 523(a)(6).

By way of example, suppose that K, a pork sausage salesman, advertises that L, a local celebrity, is wild about K's product. Unbeknownst to K (and the general public), L is an orthodox Jew and, in his community, the claim that L eats pork is scandalous. Even if L can prove that K was guilty of actual malice—i.e., that he knew L does not eat pork or recklessly disregarded that fact—L would not prevail in a § 523(a)(6) action because K did not know that the statement was substantially certain to harm L.

The second point is that a finding of "actual malice" is not incompatible with a finding that "just cause or excuse" existed for making the defamatory statement. Indeed, it likely was this very consideration which prompted the Sixth Circuit to conclude in *Wheeler* that a state-court finding of actual malice did not establish malice for purposes of § 523(a)(6). *See supra* n. 6 and accompanying text.

Conversely, the conclusion that there was no just cause or excuse for publishing the defamatory statement does not preclude the possibility that the statement was made without "actual malice." *See supra* n. 20 and p. 754. Thus my finding that Thompson acted maliciously for purposes of § 523(a)(6) does not necessarily establish "actual malice." *See Harte–Hanks Communications v. Con-naughton,* 491 U.S. 657, 666 n. 7, 109 S.Ct. 2678, 2685 n. 7, 105 L.Ed.2d 562, 576 n. 7 (1989) ("The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will."). I therefore must decide whether Merritt is a "public figure."

The Supreme Court has stated that the public figure "designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974). Specifically, then, the question is whether Merritt could properly be described as either a "general purpose" or "limited purpose" public figure when Thompson defamed him. *See, e.g., Blue Ridge Bank v. Veribanc,* 866 F.2d 681, 687 (4th Cir.1989).

With respect to the general-purpose public figure, the Supreme Court made the following observations:

> Petitioner has long been active in community and professional affairs. He has served as an officer of local civic groups and of various professional organizations, and he has published several books and articles on legal subjects. Although petitioner was consequently well known in some circles, he had achieved no general fame or notoriety in the community. None of the prospective jurors called at the trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population. We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public figure question to a more meaningful context by looking to the

nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

*Gertz*, 418 U.S. at 351–52, 94 S.Ct. at 3013, 41 L.Ed.2d 789.

This passage is instructive because it sets up what amounts to a fairly strong presumption against a finding of widespread notoriety: a person will not be deemed to be a general-purpose public figure unless there is "clear evidence of general fame or notoriety in the community." Cases decided since *Gertz* have routinely noted the difficulty of proving that the plaintiff in a defamation case is a general-purpose public figure. *See, e.g., Waldbaum v. Fairchild Publications*, 627 F.2d 1287, 1292 (D.C.Cir.), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980) ("This test is a strict one. . . . The court in *Gertz* acknowledged freely that . . . the general public figure is a rare creature."); *Partington v. Bugliosi*, 825 F.Supp. 906, 917 (D.Haw.1993).

*Gertz* is also significant in that it suggests that national fame is not necessarily required; if the plaintiff is sufficiently well known in her "community," then it may be appropriate to classify her as a general-purpose public figure. A subsequent decision of the Supreme Court, however, appears to have created an exception to this rule. In *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Court ruled that Firestone, a resident of Palm Beach, Florida, was not a general-purpose public figure, noting that she "did not assume any role of especial prominence in the affairs of society, *other than perhaps Palm Beach society.*" *Time*, 424 U.S. at 453, 96 S.Ct. at 965, 47 L.Ed.2d 154 (emphasis added). Thus *Gertz* focused on the defamed party's standing locally, whereas *Time* apparently considered whether the defamed party was known beyond the local level.

The most plausible explanation for this seeming contradiction relates to the medium by which the defamatory statements were published in each case. The statements at issue in *Time* were printed in Time magazine, which of course is readily available throughout the United States. *Gertz*, on the other hand, involved an obscure publication

of an extreme right-wing political organization. *See Gertz*, 418 U.S. at 325, 94 S.Ct. at 3000, 41 L.Ed.2d 789. Although this publication was "on sale at newsstands throughout the country," *id.* at 327, 94 S.Ct. at 3001, 41 L.Ed.2d 789, the Court also noted that "[r]espondent . . . distributed reprints of the article on the streets of Chicago," the city in which the controversy arose. *Id. Gertz* and *Time* can therefore be reconciled by interpreting the two cases as implicitly adopting the rule that the relevant population in determining the defamed party's notoriety is the population in the area where the defamatory statement is primarily distributed. *Cf. Harris v. Tomczak*, 94 F.R.D. 687, 702 (E.D.Cal. 1982) ("[T]he question is whether the individual had achieved the necessary degree of notoriety where he was defamed—i.e., where the defamation was published." (quoting *Waldbaum*, 627 F.2d at 1296 n. 22)).

As noted in *Harris*, the court in *Waldbaum* suggested that in situations involving "[d]issemination [of the defamatory statement] to a wide audience . . ., it might be appropriate to treat the plaintiff as a public figure for the segment of the audience to which he is well known and as a private individual for the rest." *Harris*, 94 F.R.D. at 702 n. 29 (quoting *Waldbaum*, 627 F.2d at 1296, n. 22). But this analysis is inconsistent with *Time*. *See Harris*, 94 F.R.D. at 702. It would also create a great deal of uncertainty: whereas the defamatory statement's primary audience can in most cases be relatively easily determined, identifying the appropriate "segment" of that audience for purposes of measuring the plaintiff's fame is a tricky proposition indeed. *See id.* ("[O]ne cannot know what region is appropriate—after all, every father may be considered well known in his own home. . . . Everyone is always well known somewhere depending on how narrowly the region is drawn and, if the measure is to be where that person is well known, the standard is never a measure of anything.").

In this case, then, I conclude that the appropriate "community" for purposes of determining Merritt's level of notoriety is the region in which the Detroit News is readily

available.[27] And while that newspaper's distribution figures are not a part of the record, I take judicial notice of the fact that the News is heavily marketed in the metropolitan Detroit area. Thus I must decide if Merritt is a public figure in that area.

The record shows that Merritt was a judge of the 53rd Judicial District Court in Livingston County, Michigan, from 1976 to 1988. He was the subject of both a criminal and a judicial ethics investigation which were widely reported in the media in Livingston County and the surrounding area between 1986 and 1988. (While still a judge, Merritt accepted censure from the Michigan Supreme Court for the incidents then in question and the criminal charges were dropped.) He also ran unsuccessfully in 1986 for a circuit court judgeship. At the time of trial, Merritt was again a candidate for elective office.

The only testimony tending to show that Merritt is a general-purpose public figure came from Merritt's own witnesses. One of these witnesses, David Morse, was the Livingston County Prosecutor. Morse testified that as late as 1989, the criminal charges lodged against Merritt were still a hot topic of public comment.

The other testimony related to testimony given in state court in connection with Merritt's request for a reduction in child support. Both Morse and an attorney in private practice, Thomas Kizer, Jr., testified that at a hearing held in February, 1989, they testified that Merritt could not expect to successfully practice law in Livingston County because of the controversy concerning the investigations and the paternity suit filed against him.

I question the inferential value of this testimony, however. In order to be a general-purpose public figure, an individual must be "a well-known 'celebrity,' his name a 'household word.'" *Tavoulareas v. Piro,* 817 F.2d 762, 772 (D.C.Cir.), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987) (quoting *Waldbaum,* 627 F.2d at 1294); *see also Harris,* 94 F.R.D. at 703. And I cannot conclude that Merritt is, or was, widely known based on testimony to that effect from only two individuals, particularly since those individuals are not members of the lay community. *Cf. Waldbaum,* 627 F.2d at 1295 (To determine if the plaintiff is a general-purpose public figure, "[t]he judge can examine statistical surveys, if presented, that concern the plaintiff's name recognition.").

A more fundamental problem both with this testimony and the other evidence is that it suggests only that Merritt is well known in the vicinity of Livingston County. As noted, the relevant community in this case is the Detroit metropolitan area. And while Livingston County may be considered a part of that region,[28] it is at best only a very small part.[29] It therefore is not necessarily representative of the greater Detroit area.

There being no evidence which clearly establishes that Merritt was "general[ly] fam[ous] . . . in the community, and pervasive[ly] involve[d] in the affairs of society," *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d 789, I reject Thompson's contention that Merritt was a general-purpose public figure.[30]

**27.** It could be argued that the relevant region should be defined by the site at which the interview with McClellan was conducted rather than where the defamation was republished in the form of the Detroit News article. But Thompson presumably intended that her remarks to McClellan be printed and distributed to the general population. Because Thompson was in essence using McClellan as a vehicle for communicating her viewpoint to a mass audience, it is appropriate to refer to that same audience in gauging Merritt's notoriety.

**28.** Even that proposition is debatable. Howell, Livingston County's largest city and county seat, is some 54 miles from Detroit.

**29.** Reference to the United States Department of Commerce 1990 Census of Population and Housing vividly illustrates this point. It indicates that in 1990, the combined population of three large counties in the region, Oakland, Macomb and Wayne, was 3,912,679. In contrast, only 115,-645 people resided in Livingston County that year.

**30.** Thompson made numerous references in a post-trial brief to alleged facts that also tended to show that Merritt was relatively prominent in his community. Because there is no evidence in the record to support these allegations, I did not take them into consideration. And even if I had, I would not reach a different result.

Nor is there any basis for concluding that Merritt is a limited-purpose public figure. As noted, that designation relates to a person who has "voluntarily inject[ed] himself or [been] drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d 789. While Merritt may have been involved in a public controversy with respect to the allegations of misconduct on his part while serving on the Livingston County bench, those allegations were totally unrelated to the substance of the defamatory statement published by Thompson. That controversy therefore did not deprive Merritt of private-person status vis-á-vis Thompson's accusation. *See Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d 789 (The determination as to whether an individual is a limited-purpose public figure requires an inquiry into "the nature and extent of an individual's participation *in the particular controversy giving rise to the defamation*." (emphasis added)); *Waldbaum*, 627 F.2d at 1298 ("[T]he alleged defamation must have been germane to the plaintiff's participation in the controversy.... Misstatements wholly unrelated to the controversy ... do not receive the *New York Times* protection.").[31]

Merritt was of course "drawn into" another controversy when Thompson made her charges of child abuse. But it was Thompson's allegations that *created* this controversy. And there is no suggestion in *Gertz* that the controversy arising from the defendant's own actions can elevate a plaintiff to limited-purpose public figure status. Indeed, lest there be any doubt about the matter, the Supreme Court subsequently stated that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979). Because there was no controversy concerning whether Merritt abused Kaitlen until Thompson made allegations to that effect, I conclude that Merritt was not a limited-purpose public figure.[32]

Having determined that neither the public-records exception or the public-figure doctrine is applicable here, I hold that Thompson's statements to McClellan were unprivileged.[33]

### 3. Fault

In *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), Chief Judge Robinson made the following observations:

When the proponent of a hybrid statement [34] discloses to the reader the perti-

---

**31.** If Merritt had still been a judge—and thus a public official—when Thompson accused him of child abuse, then a strong argument could be made that Merritt must prove actual malice. *See Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964) ("[A]nything which might touch on a[] [public] official's fitness for office is relevant [and therefore protected by the *New York Times* rule.]"). But the interview with McClellan was given more than two years after Merritt left the bench.

**32.** Other factors relevant to the limited-purpose public figure inquiry include whether there is in fact a "public controversy" and "the extent to which [the plaintiff's] participation in the controversy is voluntary, the extent to which there is access to channels of effective communication in order to counteract false statements, and the prominence of the role played [by the plaintiff] in the public controversy." *Wilson v. Scripps–Howard Broadcasting Co.*, 642 F.2d 371, 374 (6th Cir.), *cert. dismissed*, 454 U.S. 1130, 102 S.Ct. 984, 71 L.Ed.2d 119 (1981). But consideration of these factors is unnecessary in this case, since the underlying assumption is that the controversy in which the plaintiff is embroiled was not created by the defendant.

**33.** Thompson also claimed that her statements to McClellan are within the scope of Michigan's "fair comment" privilege. That privilege "affords legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact." *Rouch v. Enquirer & News of Battle Creek*, 427 Mich. 157, 180 n. 13, 398 N.W.2d 245 (1986) (citation omitted). But in cases involving a private plaintiff like Merritt, the fair-comment privilege is lost if the opinion is published negligently. *See Deitz v. Wometco West Michigan TV*, 160 Mich.App. 367, 375–79, 407 N.W.2d 649 (1987). And since Merritt must establish fault amounting to at least negligence even if the privilege does not apply, no purpose is served in addressing Thompson's argument.

**34.** "Hybrid" statements are those "which both express the author's judgment and indicate the existence of specific facts warranting that judgment." *Ollman*, 750 F.2d at 1022 (Robinson,

nent background facts with reasonable completeness and accuracy, there is a strong argument for including the statement within the realm of absolute privilege. In these circumstances, the reader can easily recognize the statement as the author's synthesis and, placing it beside the predicate facts, can make up his own mind about how much weight and credence to give to the author's conclusion.... Having supplied an accurate account of [the underlying] facts, the author cannot be said to have misled or deceived the reader about the matter discussed, even if the author's ultimate conclusion—the hybrid statement—may in some sense be erroneous....

[W]hen a hybrid statement appears without any recitation of the underlying facts, or when those facts are stated incompletely or erroneously ..., the reader is unable to place the author's judgment in perspective, because he either is completely unaware of the predicate facts or is in some degree misled as to what they are.... A reader supplied with no background at all may well suppose that there are facts which support the derogatory conclusion, particularly if it is announced by the author with apparent assurance. A reader given materially incorrect or incomplete facts, mistakenly supposing that the pertinent data are accurately assembled before him, might give even more credence to the author's conclusion. Hybrid statements unaccompanied by any predicate facts, or attended by defective recitals of the underlying facts, thus should occupy a very different position in the concerns of libel law, for their claim to First Amendment protection is far less compelling. If the background data reaching the reader are deficient, the hybrid statement is as much a

representation of the facts it implies as it is a judgment or interpretation of the communicated data....

I would hold that a hybrid statement is absolutely privileged as opinion when it is accompanied by a *reasonably* full and accurate narration of the facts pertinent to the author's conclusion. I would further hold that hybrid statements not so accompanied are not entitled to that degree of protection unless those facts are already known to the author's listeners or readers....

Under my mode of analysis, only those indulging in culpable behavior could be deterred from expressing their ideas, and I see no constitutional imperative for extending absolute protection to authors who have misled their readers by refusing or culpably failing to provide reasonably full and accurate background data....

The author's recountal of some of the background facts normally creates the inference that there are no other facts pertinent to the opinion expressed; absent some contrary indication, recipients of the communication would naturally derive that understanding. If, then, the undisclosed background facts strip away the justification the disclosed facts proffered for the disparaging remark, the communication cannot automatically be deemed a mere expression of absolutely-protected opinion, for it incorporates a falsehood by inference. The communication is really a false and defamatory representation that, squarely on the basis of such facts as were disclosed, the subject of the comment is guilty of the defamatory behavior charged.

*Ollman,* 750 F.2d at 1022–27 (Robinson, C.J., dissenting in part; footnotes omitted);[35] *cf.*

---

C.J., dissenting in part). Thompson's statements to McClellan fit this description.

**35.** Like the majority in *Ollman,* Chief Judge Robinson's comments were premised on the view that *Gertz* extended First–Amendment protection to defamatory statements which merely reflect the speaker's opinion. *See Ollman,* 750 F.2d at 975, 1016. In *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court declined to interpret *Gertz* as "creat[ing] a wholesale defamation exemption for anything that might be labeled 'opinion.'"

*Id.* at 18, 110 S.Ct. at 2697, 111 L.Ed.2d 1. Referring to the lower courts' "mistaken reliance on the Gertz dictum," the Court asserted that "'freedom[] of expression' ... is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and fact." *Id.* at 19, 110 S.Ct. at 2706, 111 L.Ed.2d 1 (citation omitted). Instead of inquiring into whether the statement at issue was in the nature of an opinion or an assertion of fact, the Court said the pertinent inquiry is whether the statement is "provable as false." *Id.*

*Chalpin v. Amordian Press,* 128 A.D.2d 81, 515 N.Y.S.2d 434, 437 (1987) (A defamatory "statement of opinion [is actionable if it] gives the impression that it sets forth the facts upon which it is based, but those underlying facts are either falsely misrepresented or grossly distorted.").

Consistent with Chief Judge Robinson's viewpoint, the Supreme Court explicitly recognized that "[e]ven if the speaker states the facts upon which he bases his opinion, *if those facts are either incorrect or incomplete* ..., the statement may still imply a false assertion of fact." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990) (emphasis added). The Court further noted that under the common law, the fair-comment privilege "did not extend to 'a false statement of fact, whether it was expressly stated or implied from an expression of opinion.'" *Id.* at 19, 110 S.Ct. at 2706, 111 L.Ed.2d 1 (citation omitted). *See also Royal Palace Homes,* 197 Mich.App. at 52, 495 N.W.2d 392 ("[A] defamation defendant cannot be held liable for the reader's possible inferences, speculations, or conclusions, where the defendant has not made or directly implied any provably false factual assertion, and has not, by selective omission of crucial relevant facts, misleadingly conveyed any false factual implication." (quoting *Locricchio,* 438 Mich. at 144, 476 N.W.2d 112 (Cavanagh, C.J., concurring))).

■ The proposition which Chief Judge Robinson unambiguously asserts in *Ollman,* and for which *Milkovich* and *Royal Palace Homes* lend support, is that a person who publishes a defamatory opinion generally must provide a reasonably accurate summary of all facts pertinent to the subject matter, including those facts which tend to undermine the plausibility of whatever inference the speaker has drawn.[36] This requirement is unexceptional: as the hypothetical offered by Chief Judge Robinson illustrates, it would be grossly unfair to Smith if the statement that "Smith is a murderer" were held not to be actionable even though the speaker failed to mention that Smith's victim was in the process of assaulting Smith with a knife when Smith killed him. *See Ollman,* 750 F.2d at 1024 n. 71.

Thus the critical question is whether the speaker gave a full and accurate account of the relevant facts and, if not, whether the failure to do so amounts to negligence (or actual malice, in the case of a public-figure plaintiff). *See id.* at 1028 (Hybrid statements are protected by the First Amendment if the "incompleteness or inaccuracy of the predicate data is nonculpable according to the applicable standard of care."); *Deitz v. Wometco West Michigan TV,* 160 Mich.App. 367, 377, 407 N.W.2d 649 (1987). It is against this standard that Thompson's comments to McClellan will be measured.

But this analysis is substantially the same as that offered by Chief Judge Robinson. *See Ollman,* 750 F.2d at 1021–22 ("At one end of the continuum are statements that may appropriately be called 'pure' opinion. These are expressions which commonly are regarded as incapable of being adjudged true or false in any objective sense of those terms.... Hybrid statements differ from pure opinion in that most people would regard them as capable of denomination as true or false, depending upon what the background facts are revealed to be."). Thus it appears that *Milkovich* was simply troubled by the nomenclature adopted by the lower courts in the post-*Gertz* era. *See Milkovich,* 497 U.S. at 24, 110 S.Ct. at 2709, 111 L.Ed.2d 1 (Brennan, J., dissenting) (noting that the majority identified "the same indicia that lower courts have been relying on for the past decade or so to distinguish between statements of fact and statements of opinion").

**36.** As Thompson pointed out, the Sixth Circuit stated that "an expression of opinion based on

revealed facts ... is ... not actionable." *Orr v. Argus–Press Co.,* 586 F.2d 1108, 1115 (6th Cir. 1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (applying Michigan law) (*quoted in* Defendant's Post Trial Brief at p. 10). But this is only a broad generalization. And while it arguably suggests that the speaker need not disclose facts that are inconsistent with his opinion, that issue was not before the court. Moreover, the decision contains passages which seem to suggest that the "revealed facts" cannot be limited to those which are favorable to the speaker's viewpoint. *See Orr,* 586 F.2d at 1115 (A newspaper that "carries *a full and accurate account* of [a] council meeting ... is not liable for defamation." (emphasis added; citation omitted)); *id.* (noting "that the reporter *accurately reported* the underlying facts concerning Orr's indictment and arrest" (emphasis added)). Thus *Orr* is not contrary to Chief Judge Robinson's thesis.

The News article indicated that Thompson told McClellan she had reported her suspicions to the authorities and that "Child protective services told [Thompson] there was no doubt that something happened." Exhibit 2. The context of the entire interview led McClellan to believe that the "something" Thompson referred to was "sexual abuse." Exhibit 31, p. 13:19–23. McClellan was firm in the face of cross-examination that "it was pretty clear we were talking about sexual abuse." *Id.* at 17:20–21.

Thus Thompson falsely implied, and McClellan reasonably inferred, that Protective Services had confirmed that Kaitlen was sexually abused. *Cf.* 3 *Restatement Torts,* 2d § 563 p. 162 ("The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express."); Prosser, *The Law of Torts,* § 116 (5th ed. 1988) ("[I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication ... he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." (*quoted in White v. Fraternal Order of Police,* 909 F.2d 512, 523 (D.C.Cir.1990))). This misrepresentation was material because the claim that sexual abuse had been substantiated lent greater credence to Thompson's contention that Merritt was the perpetrator.

It may be that Thompson did not intend to create a false impression regarding the investigation conducted by Protective Services. At the very least, however, she was negligent in the way that she characterized its outcome.

Thompson argued that the News article left out important details that she had provided to McClellan in support of her suspicions. *See* Defendant's Post Trial Brief at pp. 10–12, 20. But there is no indication in the record that Thompson provided McClellan with more evidence of abuse than was related in the article. Thompson herself did not so testify. And while McClellan stated that she left out graphic details from Thompson's story in writing the article, *see* Exhibit 31, p. 9:21–23, she did not suggest that the

article omitted evidence tending to corroborate Thompson's allegation.

In any event, I do not think that Thompson's contention, even if it were true, would mitigate her fault. The persuasive force of evidence pointing to a particular conclusion is inversely related to the weight of the evidence pointing to a contrary conclusion. For example, assume that R claims S is a rapist. To support her assertion, R cites the fact that she was one of 10 persons who witnessed the alleged crime, and also points out that two of the witnesses videotaped S in *flagrante delicto.* Assume further than in publishing her defamatory statement, R inadvertently gives the false impression that S had been convicted for the offense. Because of the overwhelming evidence in support of R's claim, one could argue that the misstatement is irrelevant, on the theory that the erroneous information could not reasonably be expected to convince an otherwise skeptical audience as to the veracity of R's claim. *See Ollman,* 750 F.2d at 1024 ("[T]he author's presentation [of the pertinent facts] must ... enable the audience to fairly judge the conclusion stated."); *cf. Rouch II,* 440 Mich. at 271, 487 N.W.2d 205 (errors in a newspaper article were insignificant because they "did not affect the article's substantial truth").

In this case, however, the entire body of evidence that Merritt abused Kaitlen is not nearly so strong as to render harmless the flaw in Thompson's account of the pertinent facts. Thus it makes no difference that Thompson may have fully explained to McClellan the reasons why she suspected Merritt.

On the strength of *Rouch II,* Thompson also argued that any inaccuracies in the article are irrelevant because the "gist" of the article was true insofar as it cast Merritt in a negative light. *See* Defendant's Post Trial Brief at p. 27. According to Thompson, the thrust of the article was that Merritt was "in the process of exacting financial revenge from Ms. Thompson for the unfounded charges of sexual abuse." *Id.*

The problem with this argument is that it focuses on the manner in which Thompson's

statements were republished in the News article, rather than the manner in which Thompson published her statements to McClellan. The gist of the *publication* was that Merritt sexually abused Kaitlen. Whether that is also true of McClellan's *republication* is irrelevant to the question of Thompson's culpability.[37]

By inaccurately characterizing the conclusion reached by Protective Services, Thompson substantially overstated the strength of her case against Merritt. Because she was at least negligent in leading McClellan to believe that the authorities had substantiated sexual abuse, Thompson's conduct was culpable for purposes of Mich.Comp.Laws § 600.-2911(7).

### 4. Special Harm

■ Under Michigan law, sexual contact with a person under 13 years of age is a felony. *See* Mich.Comp.Laws § 750.520c. Because Thompson in effect accused Merritt of committing that crime, the accusation constituted defamation *per se*. *See Jones v. Schaeffer*, 122 Mich.App. 301, 304, 332 N.W.2d 423 (1982) ("False accusation of a crime is slander per se."); Mich.Comp.Laws § 600.2911(1). Accordingly, Merritt did not need to prove "special harm" in order to establish a cause of action. *See Rouch I*, 427 Mich. at 173–74, 398 N.W.2d 245 (Defamation *per se* means that the defamatory statement is "actionab[le] ... irrespective of special harm." (citations omitted)).

### III. *Damages*

Damages that may be awarded in a defamation action include those which are sometimes denominated as "general" and those which are "special." *See, e.g., Sias v. Gener-al Motors Corp.*, 372 Mich. 542, 550, 127 N.W.2d 357 (1964). Although not using this terminology, Merritt argued in effect that he is entitled to both forms of compensation.[38]

Pecuniary losses are included within the concept of general damages. *See Sias*, 372 Mich. at 550, 127 N.W.2d 357; *see also* D. Dobbs, *Remedies* § 7.2 (1973). Such damages are also designed to compensate "for the affront to the plaintiff's dignity and the emotional harm" caused by the defamation. *Id.* at § 3.2. *See Sias*, 372 Mich. at 550, 127 N.W.2d 357; *Clair v. Battle Creek Journal Co.*, 168 Mich. 467, 473, 134 N.W. 443 (1912).

■ General damages may be presumed in cases which, like this one, involve defamation *per se*. *See Sias*, 372 Mich. at 551–52, 127 N.W.2d 357; *McCormick v. Hawkins*, 169 Mich. 641, 650, 135 N.W. 1066 (1912); *Clair*, 168 Mich. at 473, 134 N.W. 443. *But see Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 763, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985) (indicating that the presumption of damages violates the First Amendment if the defamatory statement relates to a "matter[] of public concern"). However, Merritt did not argue that he was entitled to presumed damages. To the contrary, he affirmatively stated that it was his obligation to prove damages, *see* p. 3 of Plaintiff's Trial Brief, and the case was tried based on that premise. Accordingly, Merritt's right to damages will be assessed on the basis of the evidence adduced at trial, without the benefit of any presumption that he was harmed by the defamation. *See In re Campbell*, 58 B.R. 506, 507–08 (Bankr. E.D.Mich.1986) (The court's "function is to evaluate the legal arguments proposed by the parties, not to make those arguments for them.").[39]

---

37. However, the extent to which the accusation was tempered or neutralized by McClellan in her article is relevant to the question of damages. *See infra* n. 42 and accompanying text.

38. Merritt alleged in paragraph V of his complaint that Thompson was "liable for punitive damages." But he did not request such relief in the *ad damnum* clause of the complaint, nor did he raise the issue in the joint final pre-trial order or at trial. I therefore assume that he abandoned this request.

39. The principle that courts must generally avoid assuming the role of an advocate is not premised solely on the notion that the litigants should do their own work. As this case illustrates, a litigant could be unduly prejudiced by judicial intervention. Had Merritt claimed a right to presumed damages, then Thompson may well have raised arguments in response that would not otherwise have been raised. For example, Thompson may have argued that the presumption was inappropriate because Merritt was in a position to demonstrate the extent of his damages with reasonable accuracy. *See, e.g., Carey v.*

A Michigan statute specifically provides that damages for emotional distress may be awarded in a defamation action. Subsection (2)(a) of Mich.Comp.Laws § 600.2911 states that, "[e]xcept·as provided in subdivision (b) [which permits exemplary and punitive damages under some circumstances], in actions based on libel or slander the plaintiff is entitled to recover ... for the actual damages which he or she has suffered in respect to his or her ... feelings." By its terms, this subsection would appear to apply to all defamation actions. But in a remarkable display of draftsmanship, an apparent exception to this rule is created by subsection (7) of the same statute, which states that a private plaintiff's "[r]ecovery [is] limited·to economic damages including attorney fees." Mich. Comp. Laws § 600.2911(7). In *Glazer v. Lamkin*, 201 Mich.App. 432, 437, 506 N.W.2d 570 (1993), the court purported to reconcile these conflicting provisions by interpreting subsection (7) as precluding private plaintiffs from recovering for "injuries to feelings" absent a showing of actual malice.

█ Those damages which are denominated as "economic" are well understood as excluding damages for emotional distress, as

such. *See, e.g., Veselenak v. Smith,* 414 Mich. 567, 573–74, 327 N.W.2d 261 (1982); D. Dobbs, 2 *Law of Remedies* § 7.2(11) (2d ed. 1993). Thus while *Glazer's* interpretation of § 600.2911(7) was arguably *dictum,* [40] the court was correct in assuming that "damages to reputation or feelings" are not within the scope of economic damages, as that term is used in § 600.2911(7). 201 Mich.App. at 437, 506 N.W.2d 570.[41] Accordingly, Merritt has no right to recover damages for emotional distress.

However, Merritt does have a right to reimbursement to the extent he can prove that the News interview caused him economic harm. *See id.* In this regard, Merritt claimed to have incurred out-of-pocket expenses and loss of income as a result of the subsequent article. Thompson argued in response that no such damages should be awarded because the article blunted the defamatory impact of her allegation.

It is true that McClellan substantially softened the blow of Thompson's accusation. The article mentioned the fact that "[n]o criminal charges were ever filed against Merritt relating to any alleged abuse, and DSS [the Michigan Department of Social Services]

---

*Piphus,* 435 U.S. 247, 262, 98 S.Ct. 1042, 1051, 55 L.Ed.2d 252 (1978) ("The doctrine [of presumed damages] has been defended on the grounds that ... [reputational] injury is extremely difficult to prove."). Or she may have argued that a presumption of damages was unconstitutional because the defamation involved a public issue. *See Dun & Bradstreet,* 472 U.S. at 763, 105 S.Ct. at 2947, 86 L.Ed.2d 593. Since she did not have the occasion to make these (or any other) arguments relative to the question of presumed damages, it would be fundamentally unfair for me to raise that issue *sua sponte* after the trial has concluded. Such an approach would also not be conducive to thoroughly reasoned decisionmaking. *Cf. Ladner v. United States,* 358 U.S. 169, 173, 79 S.Ct. 209, 211, 3 L.Ed.2d 199 (1958) (where the Court declined to consider an "important and complex" issue, noting that "there was only meager argument of the question" and indicating that it would take up the question "in another case ... [when it] is adequately briefed and argued").

**40.** The issue in *Glazer* was whether the trial court had properly granted summary disposition for the defendant based on the plaintiffs' "fail[ure] to show that there was a genuine issue with respect to whether they suffered economic damage as a result of defendant's alleged slan-

der." 201 Mich.App. at 437, 506 N.W.2d 570. The court determined that it was improperly granted "because plaintiffs would be entitled to actual damages for hurt feelings under [Mich. Comp.Laws § 600.2911]2(a) if they could show actual malice." *Id.* It nevertheless affirmed the lower court's decision on the more fundamental ground that the plaintiffs failed to establish "a genuine issue of material fact that defendant made statements slandering or libelling plaintiffs." *Id.* at 438, 506 N.W.2d 570.

**41.** More problematic is the court's determination that, despite § 600.2911(7), a private plaintiff "is entitled to ... actual damages to reputation or feelings" pursuant to § 600.2911(2)(a) if he "proves actual malice." 201 Mich.App. at 437, 506 N.W.2d 570. This conclusion seems logical, since even a public figure—whose privacy and dignitary rights are less protected from defamatory speech than are those of a private figure— may recover such damages if actual malice is shown. Unfortunately, however, the text of § 600.2911(7) gives no clue that the damage limitation applies only to cases involving negligence.

In any event, this aspect of the *Glazer* decision is of no avail to Merritt because he did not prove that Thompson was guilty of actual malice.

774

has not tried to suspend his visitation rights." Exhibit 2. Merritt's point of view was also presented. The article quoted him as saying that Merritt's wife and her children had "gone through a living hell with [Thompson's] allegations," *id.*, and noted that "Merritt filed a $1–million slander and libel lawsuit against Thompson" because of the accusations of abuse. *Id.* Perhaps most important in terms of diluting the "sting" of Thompson's charge, the article asserted that

> [e]xperts say the dispute [between Merritt and Thompson] reflects a troubling trend in child custody disagreements. "Sexual abuse charges in custody cases are becoming quite common," said state Department of Social Services spokesman Chuck Pellar. Of 50,000 potential abuse and neglect referrals DSS received last year, Pellar said, 31 percent were substantiated by social services.... "[O]ver 90 percent of [charges of child sexual abuse made by women against men] turn out to be totally false." [Quoting Ziad A. Fadel, described in the article as "a Southfield lawyer who specializes in such cases"]

*Id.*

Based on these considerations, and in particular the statistics cited in the passage quoted above, the average reader might well infer from the article that there is a distinct possibility—if not a likelihood—that Thompson was falsely accusing Merritt. But that is as far as the article went: while it alerted the reader to the fact that charges of abuse are sometimes fabricated, the article did not contend or purport to demonstrate that *Thompson* 's charges were bogus. Because the article was essentially agnostic as to which of the parties was telling the truth, it would be entirely reasonable for a person to entertain serious doubts about Merritt after having read it. Thus while the article deflected much of the potential for injury inherent in Thompson's statements to McClellan, it did not entirely do so.[42]

The testimony of Merritt, Kizer, McClellan and the clinical psychologist Merritt consulted, Dr. Rudolf Bachmann, make it clear that the News article caused Merritt considerable emotional distress. After the article was published, Merritt paid Dr. Bachmann a total of $1,050 for 15 counseling sessions. Because it was both reasonable and foreseeable that Merritt would seek this kind of professional assistance in an effort to cope with the equally foreseeable negative publicity resulting from the interview, I find that Merritt is entitled to recover these expenditures from Thompson in full. *See* D. Dobbs, 2 *Law of Remedies* § 7.2(2) ("The plaintiff is ordinarily entitled to recover damages for all the harmful consequences reasonably to be anticipated from the publication. This includes harm caused when the initial audience republishes the defamation to others, so long as republication is reasonably foreseeable." (citations omitted)); *see also id.* at § 7.2(11) (economic damages in a defamation case include "medical expenses reasonably incurred when mental distress or physical ill-health is a proximate result of the defamation" (citation omitted)).

The only evidence of lost income, however, consisted of vague and conclusory testimony from Merritt and Kizer. Merritt stated that his practice had been showing steady economic improvement from its inception in late 1989 up until publication of the News article, and that this rate of improvement was negatively affected by the article. Merritt's nominal employer, Kizer, testified that he was troubled by Merritt's lack of earnings growth, a phenomenon which he attributed to the article.

The foregoing testimony comprises two related but distinct assertions, each of which is essential to Merritt's claim for lost income: (1) that Merritt's law practice fared less well economically than expected in the time period following publication of the News article, and (2) that this misfortune was caused by the article.

It would not be particularly difficult to provide documentation supporting the first assertion. Income figures for Merritt's practice—which Kizer said were maintained—for

---

**42.** Thompson is nevertheless fortunate that the article was balanced and generally sympathetic to men accused of child abuse. Had that not been the case, the negative economic impact of the article would likely have been much greater.

the period from late 1989 to March 25, 1991 (when the article was published) could be compared to those for the period from March 25, 1991 through the end of June, 1992 (shortly before this matter was tried). Alternatively, records could be produced showing that the rate of growth—in terms of new clients or new business from established clients—had leveled off or declined following publication of the article. Perhaps another approach would be to compare Merritt's financial figures for the post-article period to those projected for a similarly situated practitioner based on local or state-wide surveys.

Since Merritt did not produce any such records or otherwise explain his failure to do so, I assume that the hard data do not show that his law practice was less successful than anticipated following publication of the News article.[43] *See, e.g., NLRB v. Advance Transportation Co.,* 965 F.2d 186, 195 (7th Cir. 1992). Because this negative inference more than rebuts the minimal evidentiary value of Merritt's self-serving testimony and that of his friend Kizer, Merritt failed to prove that he experienced post-article financial harm. He therefore is not entitled to damages for lost income.[44]

### CONCLUSION

Because Thompson honestly suspected that Merritt was sexually abusing Kaitlen, she had just cause or excuse to communicate her concern to the appropriate authorities. She therefore did not act maliciously in doing so.

There was no just cause or excuse, however, for Thompson's decision to air her suspicion of abuse to a reporter for the Detroit News. This action caused damage to Merritt in the total amount of $1,050, an indebtedness which is excepted from discharge by

§ 523(a)(6). An appropriate judgment shall enter.

---

**43.** Kizer testified that in 1991, Merritt had gross revenues in the vicinity of $40,000. But that figure does not differentiate between pre- and post-article income, nor did Merritt assert—let alone show—that these revenues were less than they should have been. The testimony is therefore meaningless.

**44.** Consistent with this conclusion, it seems that Merritt himself all but conceded that the article's economic consequences were minor. On page 4 of his trial brief, Merritt contended "that he has sustained actual economic damages, but that these damages are far outweighed by the damage to his feelings."